No. 84,275

STATE OF KANSAS, *Appellee*, v. PATRICIA LEE LEITNER,
*Appellant.*
(34 P.3d 42)

Opinion filed
October 26, 2001.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Douglas P. Witteman*, county attorney, argued the cause, and *Athena E. Andaya*, assistant attorney general, *Stephen D. Maxwell*, assistant attorney general, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Patricia Lee Leitner, from her conviction for first-degree murder of her ex-husband, Michael. She was sentenced to life imprisonment.

Leitner raises four issues on appeal. She contends the trial court abused its discretion when it allowed the State to cross-examine her concerning her involvement with a pagan religion. She also contends the trial court abused its discretion when it allowed a Kansas Bureau of Investigation (KBI) agent to testify that in his opinion a State witness was not involved in the murder. She claims she was denied due process and a fair trial because of prosecutorial

misconduct and that the trial court abused its discretion when it limited cross-examination of a State witness to the scope of direct examination.

Leitner met Michael when she was 17 years of age and he was 24 years of age. A common-law marriage followed and two sons were born to the union. Leitner testified that it was an abusive marriage and that Michael frequently physically abused her. Leitner testified that she tried to end her relationship with Michael by poisoning him in February 1998. She stated that she poisoned him because she wanted the beatings to stop. She told the jury that because Michael was threatening her with guns, she "knew that one of these times that he was going to do it." Leitner admitted the first time she tried to poison Michael, she crushed up D-Con rat poison and put about a teaspoon of it in a pot of coffee. Michael drank the coffee but did not even become ill. Leitner stated that the second time she attempted to kill him, she sliced wild mushrooms into an omelette, thinking they were poisonous. The mushrooms did not affect him.

In July 1998, Leitner obtained an emergency divorce from Michael. Leitner was awarded the couple's residence and the proceeds of a sales contract of a tavern they had sold on contract along with other property. Custody of their two sons was given jointly to Leitner and Michael.

Less than 2 months later, Michael filed a motion to set aside the property settlement agreement, claiming that at the time he signed it, he was in "no condition to fully understand and appreciate [its] significance."

Leitner's babysitter, Honee Larcom, testified that Michael had continued to call Leitner following the divorce to ask about the boys. She continued to babysit for Leitner almost every weekend following the divorce. Larcom testified that during conversations with Leitner in late August or early September 1998, Leitner complained about Michael, saying he would not keep a job, he did not make enough money, and that if he would just die, her family would be better off. Larcom testified that Leitner told her:

" 'You know, if he would just die my family would be so much better off. I wish he would just die because he has [a] life insurance policy, we got it when we

bought the house, and I could get like $70,000,' and the boys, they'd be set she said 'cause they could get social security. They could get like $700 a month till they're 18."

Larcom also testified that she and Leitner talked about Leitner's income. Larcom knew Leitner received $500 a month in payments from the sale of a tavern that she and Michael sold. Leitner told her there were only two more payments remaining on the contract, which worried Leitner. Larcom said that Leitner was going to apply at the Kansas State Department of Social and Rehabilitation Services for food stamps and talked about getting a job. Leitner asked Larcom whether she could babysit while Leitner worked.

Tammy Warner, Leitner's younger sister, testified that she came to Kansas to visit Leitner in September 1998. Warner heard Leitner make threats toward Michael but believed Leitner was just angry because of the divorce. Leitner told her that "things would be better for her and the kids if Michael was dead, then they wouldn't have to worry about it no more . . . it'd be so easy to have it done, you just make a phone call, you know, she knows people."

Sometime on a weekday prior to Saturday, October 3, 1998, Leitner went to Chanute, Kansas, to see her insurance agent, Robert White. She paid the insurance premiums on her house, Michael's vehicle, and her 1991 Dodge Dakota pickup truck. White gave Leitner a document concerning insurance coverage on Michael's vehicle. Leitner told White she would be seeing Michael that weekend and would have him sign the document to take him off the policy. Michael's visitation with their two boys was scheduled for the weekend of October 2 and 3, 1998. On Thursday, October 1, 1998, Michael telephoned to cancel his visitation with the boys. Leitner was upset because "he had been cancelling visits and it was really starting to hurt the boys."

On Friday afternoon, Gary Hockett, Leitner's brother, and his daughter went to Leitner's house to ask if Leitner and his wife Pam wanted to go out that evening. Leitner called Larcom and asked her to babysit all four children at her house. After Larcom arrived, Gary, Pam, and Leitner left in separate vehicles to go to Gary's house to get ready. At Gary's house, Leitner told Gary and Pam

that she was not going to go with them because she felt she really needed to talk with Michael.

Leitner testified that "Gary didn't really want me to go at first originally and then he—that's when he decided that he didn't have a problem with me going if I took protection with me just in case." Leitner was referring to Pam's and Tammy Warner's two handguns. She stated that Gary retrieved Tammy's gun out of a green box, then Pam got hers out of her purse and handed it to Gary. Leitner testified that Gary loaded the .380 caliber and .22 caliber handguns for her while she went to the liquor store to buy him a 12-pack of beer. Earlier in the trial, Leitner reported to jurors that she owned a .22 caliber Ruger at the time of her divorce and that in September 1998, she purchased a .25 caliber semiautomatic handgun for her protection. That night, however, Leitner used Gary's and Pam's .380 caliber and .22 caliber handguns to shoot Michael.

Kenny Wisdom testified that he worked with Michael at the Wyncroft Hill Apartments in Olathe on Friday, October 2, 1998. Around 7:30 p.m., Wisdom, a girl named Cindy, Michael, and Michael's brother, Jeff, met in Jeff and Michael's apartment. Wisdom stated that around 8 p.m., he and Michael went to the liquor store in Wisdom's car. Prior to leaving the parking lot, a truck drove by on another road. Michael told Wisdom, "That looked like my ex-wife's truck." At the liquor store, Wisdom bought a case of beer, and Michael bought "a pint bottle of something." Wisdom dropped Michael off in the parking lot of the apartment complex.

Leitner testified that when she arrived in Olathe, she drove around until she located the apartment complex where Michael worked. Leitner stated that Michael had given her his address that week. She did not know Michael's apartment number, but her son Eric thought it was 203 or 302. After she saw Michael's truck, Leitner said she found a place to park, got out, and knocked on a few doors. Christopher Paul answered the door of one of the apartments and later identified Leitner for investigators.

Leitner testified that when she saw Michael walking in the parking lot, she yelled his name and they spoke to one another. She told Michael she did not want to go into his apartment but pre-

ferred to go to a public place. She stated that Michael told her his truck was not running right so she drove to a nearby park to talk. Leitner testified that Michael asked about going to Toronto for the weekend so they could talk to their sons together and said he offered to pay for her gas. She said Michael went to his apartment to get a change of clothes. When he got back in the truck, she handed him the insurance document, and he put it inside his coat pocket.

Jeff testified that in September and October 1998, he lived with Michael in the Wyncroft Apartments in Olathe in apartment 302. When Jeff left the apartment to get groceries around 9 p.m. on October 2, 1998, Wisdom, Cindy, and Michael were there, but when he returned, they were gone. Jeff testified that he owed Michael money for back rent, so after purchasing groceries he withdrew $550 from an ATM machine at 9:24 p.m. The bills Jeff received from the ATM machine were the new-style $20 bills. Jeff went back to the apartment, and at approximately 10:30 or 11 p.m., Michael returned. Michael told Jeff that Leitner was outside in her truck and he was going to go to Toronto with her. Leitner never came into the apartment. Michael seemed surprised by the fact Leitner was there and that she was crying and very upset. Jeff stated that since Michael had reopened the divorce case and Leitner showed up all of a sudden, he did not think it was a good idea for Michael to go with her. Jeff said that Michael had a brown Ford truck in good condition and that he could have driven to Toronto. Jeff said he tried to give Michael $300 that he owed him, but he did not want to carry that much with him, so Michael gave $200 back to Jeff and took $100 in new-style $20 bills.

Leitner told jurors that after stopping at an Ottawa convenience store, Michael took over driving her truck. Leitner testified that Michael took a couple of swigs of butter shots, a kind of liquor, on the trip to Toronto. She said Michael's demeanor changed on the trip to Toronto and he hit her in the stomach with the back of his fist. She testified that he stopped the truck on a road and got out to relieve himself, then sat on the bumper and lit a cigarette. She said she got out of the truck, relieved herself, then retrieved her cigarettes and gun. Leitner was wearing a black duster and had

placed a gun in each pocket. She lit a cigarette and went back to the rear bumper to smoke it. Leitner testified Michael hit her "upside the head" and then he started choking her as she was standing at the side of the truck. She said he put his hands around her neck, commented that all he had to do was to squeeze harder, and then started squeezing her Adam's apple. Leitner said she kicked him with both her legs, then pulled the guns from her pocket, and shot him as he was getting up.

At trial, Gary testified as a State's witness as a result of a plea agreement. Gary stated that he left the .380 caliber and .22 caliber handguns at Leitner's house after target shooting on September 4, 1998, and had not given them to Leitner on Friday, October 2, 1998, as she claimed. Gary stated that on Friday, Leitner came over to his house, as they were getting ready to go out, and told him she had changed her mind and was going to Olathe to try to work things out with Michael. Gary said, "She was upset and everything about the way things had been going with her and Mike and she was wanting to resolve it." Gary testified that Leitner left around 7 p.m. He and Pam went to Iola to Wal-Mart, ate supper at the Greenery Club, and then went to the Road Island Club on Highway 75 south of Burlington until 2 a.m. Gary stated that when they returned to their house in Toronto between 5 and 5:30 a.m., Leitner's pickup was parked outside the house and Leitner was asleep on their couch.

Gary woke Leitner up and asked her what was going on, and she said she used both of them. He asked what she meant, and she said, "I used both guns. . . . I shot Mike." He asked her why she used his guns, and she replied, "Because they was there . . . I wanted to make sure they was—it was a big enough gun to stop him." Gary testified that Leitner said she tried to shoot him earlier on the way to Toronto when she had pulled into a roadside park, but someone had pulled up, so she put the gun back in her coat and got back in the truck. Leitner told Gary that she had shot Michael later somewhere outside Gridley, first using the .380. After he fell to the ground his arm moved, so she took the .22 and shot him twice in the side of the temple.

Pam also testified at trial as a result of a plea agreement. She talked about many statements Leitner had made, both before and after she killed Michael. Pam said that Leitner loved her house and had said she would do anything to keep it. Pam reported that on Friday, October 2, 1998, the two guns used in the homicide were at Leitner's house because that is where she and Gary left them after some target practice at Leitner's in September. She stated that Leitner reported that she was the one who had asked Michael to come to Toronto to work things out. Leitner also told her that Michael told Jeff that he was going to spend the weekend with another woman in Olathe. Pam testified that Leitner said she turned off the highway to Gridley onto back roads and drove until she could not see any houses. Leitner told Pam she walked up behind Michael and shot him in the head once, then twice again in the temple as he lay on the ground to make sure he was dead. Then she picked up a few of the shell casings and drove away. Pam further testified that Leitner threatened her more than once by talking about the big gray hole in the back of Michael's head and making the statement, "Now you see what happens to people who cross me." Pam also said that on several occasions Leitner told her she was such a good actress that she could plead temporary insanity or spousal abuse and get anybody to believe it.

Gary testified that Leitner told him she took Michael's wallet so the authorities would not be able to identify him as quickly. He also said that Leitner was not worried about her fingerprints on the guns because she had worn gloves. Gary initially agreed to help his sister and wiped down the inside of her truck for fingerprints and buried the guns, wallet, and ammunition. Gary said they only wiped down the passenger side of the truck because that was where Leitner said Michael sat. In addition, Gary testified that on Saturday morning, when he, Pam, and Leitner returned to Leitner's house, Leitner paid Larcom for babysitting. Leitner made the statement, "We'll just let somebody else pay for it this time," and handed Larcom some cash. Gary thought the cash was from Michael's wallet.

Larcom testified that on Saturday, October 3, 1998, Leitner, Pam, and Gary came to Leitner's house around 6:30 or 7 a.m.

Leitner paid Larcom $60 for babysitting, using three new-style $20 bills.

Gary stated that he continued to cover up for his little sister until October 20 or 21, 1998. Around October 7, Gary asked Leitner why she shot Michael. Gary testified that she indicated it was for the boys' sake; not just for their mental and physical well-being, but also for financial well-being. Gary stated, "She didn't think Mike needed to be around the boys at all and she didn't—she knew that if something had to happen to Mike that things would be took care of. . . . The boys would get social security, the house would be paid for, basically that type of deal." Gary further told the jurors that his sister suggested he ought to take "the rap" because he could beat it. He did not like that idea.

A little after 8:30 a.m. that Saturday morning, October 3, 1998, Tom Kraft found Michael's body lying on Iris Road just north of the Woodson-Coffey County line. Kraft summoned police to the scene. Gene Morrow, a detective with the Coffey County Sheriff's Department, was one of the officers who responded to the call. Morrow testified he saw no signs that there might have been a struggle at the scene. In addition, he said the only footprints were Michael's. Although police found no wallet on the body, they were able to tentatively identify Michael because of the insurance papers they found inside his jacket pocket. Morrow stated that they were later able to locate Michael's suitcase in a ditch 1 to 2 miles south and east of the crime scene. In addition, Morrow testified that on October 22, 1998, Gary came to him and confessed that he had conspired with Leitner to cover up the crime and conceal evidence.

Dr. Erik Mitchell, a forensic pathologist who serves as coroner for several counties in Kansas, gave expert testimony at trial. Mitchell indicated that Michael had three gunshot wounds to the head. He testified that the wound on the back of Michael's head was a contact wound where a gun was pressed up against his head and fired. Mitchell testified he believed the most likely sequence of events was that the gunshot to the back of the head was first, followed by two shots to the temple after Michael dropped to the ground.

On October 22, 1998, Leitner was arrested and charged with the premeditated first-degree murder of Michael. Although Leitner initially indicated that she would rely on the battered woman syndrome as a defense, she later decided not to do so. After a 7-day jury trial, a jury convicted Leitner of first-degree murder on August 31, 1999. On October 6, 1999, Judge Phillip M. Fromme imposed a sentence of life imprisonment, with the eligibility of parole after serving 25 years of confinement.

## I. CROSS-EXAMINATION CONCERNING WICCA, A PAGAN RELIGION

The first issue for determination is whether the trial court committed an abuse of discretion when it allowed into evidence the State's cross-examination of Leitner concerning her involvement with Wicca, a pagan religion, sometimes referred to as witchcraft.

"The admission and exclusion of evidence lies within the sound discretion of the trial court." *State v. Lumley*, 266 Kan. 939, 953, 976 P.2d 486 (1999). " ' "[I]t is clear that our standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion." ' [Citation omitted]" 266 Kan. at 950. Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Williams*, 268 Kan. 1, 8, 988 P.2d 722 (1999).

On February 17, 1999, Leitner filed a pretrial motion in limine asking the trial court to prohibit counsel and witnesses for the State from, among other things, "making reference to, eliciting testimony or offering evidence of . . . [t]he alleged practice of 'witchcraft' by the accused." The trial court heard oral arguments on pretrial motions on March 3, 1999. The State offered no objection to an order excluding such evidence. The court granted Leitner's motion in limine in its entirety.

On the third day of the jury trial, the court heard the arguments of counsel on several issues outside the presence of the jury. The judge stated:

"[W]ith regard to the issue of witchcraft, that the court has determined . . . after reviewing K.S.A. 60-445 the court has discretion to exclude certain evidence, and as far as my knowledge of the case . . . I question whether the State's able to

*show how* her involvement with witchcraft or membership in any organization, religious beliefs, are related to the crime charged, and without a showing of that I think it's highly prejudicial for that material to be before the jury, and we did have a motion in limine on that, and I think I'll hold you to that. . . . I'll forewarn you that I do find this fairly highly prejudicial potentially to the jury and very little probative value as far as showing how even her subsequent acts might relate to the crime . . . ."

The State agreed to instruct its witnesses of the court's ruling. The trial court, noting that it was possible that defense witnesses could "open the door" to this subject, stated "if they do we'll deal with it at that time."

Later, during a recess in the trial outside the hearing of the jury, the State again raised the topic of questioning witness Pam Hockett regarding Leitner's witchcraft activities following Michael's murder. The State proffered to the court that Pam would testify

"that defendant was using a black caldron, she cooked flowers in there, seeds, and did chants of some sort, and she slept with some type of tree branch, and I think it was oak, over her bed, and these were all particular to the defendant's beliefs in what I'm going to call witchcraft but I think she calls Wicca. . . . [T]he defendant did these behaviors as protection spells . . . to be protection from the KBI . . . discovering what she did to her ex-husband."

Again, the court ordered the State not to "get into that area" because of the high prejudicial value of the testimony. The trial court noted that this evidence might possibly show some evidence of consciousness of guilt but determined that there was other evidence of that nature available.

On Friday, August 27, 1999, the defense called Leitner to the stand. She testified about the events that occurred the night of Michael's death, their marital history, and about many specific instances of physical abuse Michael inflicted on her. She testified that after a certain time period, Michael stopped hitting her in the face but would hit her in places where her clothes would cover the injuries. She stated that did not seek medical attention after these instances because Michael was her nurse afterward and twice gave her stitches using "fishing line and a mattress needle." Leitner testified that she intentionally shot Michael three times after he hit her in the stomach and choked her.

Following the direct examination of Leitner during a hearing outside the presence of the jury, the prosecutor again broached the topic of her involvement with witchcraft. The prosecutor asserted that "[t]he defendant in her testimony has opened the door to several items . . . when she testified about the nature of the relationship with the victim, Michael Leitner" and stated that witnesses had alleged that "the reasons Michael hit her on a couple of occasions was that the defendant was involved in witchcraft and he didn't like it, being the reason for possibly Michael hitting her." The central concern of the prosecutor regarding Leitner's testimony was that she had misled the jury by making direct misstatements about her sexual experience with men prior to and during her marriage to Michael, about reporting to others that he abused her, and about the lack of provocation on her part when Michael hit her. Counsel for Leitner argued that as to "the affairs or the witchcraft, nothing Patricia testified to touched on those issues . . . . It's not relevant. It's highly prejudicial." The prosecutor countered by stating, "Well, oh, he wants her to be able to testify, your Honor, that all this abuse occurred, but we're not allowed to get into *why it may have occurred and that it may be her fault* that she was involved in things that Michael didn't want her to." (Emphasis added.)

After a brief discussion of another issue, the court stated: "I'm concerned about the witchcraft. Do you have witnesses . . . that can testify that beatings were a result of her involvement . . . in witchcraft?" The State made the proffer that testimony of Leitner's sister, Tammy Warner, would be that Leitner only told her of two occasions of abuse, one of which was when Michael found out Leitner had attended a pagan ritual involving witchcraft and the other when he learned she was dating a man involved in it. Counsel for Leitner argued that the prosecutor seemed to be arguing "that the witchcraft and the affair justified the beatings." The trial court acknowledged that "I don't know that there's any justification for beatings." The court ruled, however, that despite efforts to keep the issues of witchcraft, prostitution, and fires from the jury, Leitner's testimony appeared to open the door. Therefore, the court decided to allow the State to cross-examine Leitner about her for-

mer involvement with prostitution, witchcraft, and extramarital affairs. Leitner's attorney requested a standing objection to any of this evidence coming in. The trial court required the attorney to make specific objection or to just say objection.

The State proceeded to cross-examine Leitner concerning her testimony of Michael's past physical abuse. Defense counsel objected on the grounds of relevancy, but the court allowed the questioning to continue. Leitner denied that she had been hit by Michael after he had caught her having sex with another man.

Next, the State brought up the subject of witchcraft. Following another objection by Leitner's counsel, the court allowed the State to continue. The State repeated the question, asking Leitner whether she "got into an argument with Mike because [she] had entered into witchcraft and [she] had gone to a pagan ritual ceremony . . . ." Leitner denied it, stating that "none of the times that I got beat up was it ever or ever had anything to do with pagan religion."

Following that exchange, the trial record reads:

"Q. You're not denying that you were involved in that though?
"A. No, I am not.
"Q. You in fact were involved in that?
"A. Wicca.
"[Counsel for Leitner]: Judge, this is beyond the scope. I think the State has exceeded the boundaries.
"THE COURT: Well, I don't know that we need to go further at this point.
"[The State]: I just want to make sure she wasn't denying she was involved in that.
"[Leitner]: No."

At trial, the prosecutor argued he should be able to question Leitner about witchcraft to clarify for the jury why the physical abuse may have occurred due to her fault because she was involved in things that Michael did not like. On appeal, the State contends that, in an effort to counter Leitner's testimony that Michael indiscriminately physically abused her, it "sought to present evidence that he disliked her practice of witchcraft which caused marital strife." The State's asserted purpose was to impeach Leitner and "to put into context Michael's alleged action against the defendant on the specific instance testified to by the defendant." Further, the

State argues that the trial court used the balancing test provided in K.S.A. 60-445 and properly found that the value of the evidence was not outweighed by the risk of unfair prejudice.

Conversely, Leitner argues that "[t]he use of the word 'witch' to evoke terror in the jury in a contemporary criminal trial echoes the cries of 'communist' in the McCarthyist 1950's or 'witch' in the days of Salem." Relying on *State v. Pham*, 27 Kan. App. 2d 996, 10 P.3d 780 (2000), Leitner asks for a new trial because "there was no probative value to balance against the extreme prejudice from the introduction of the witchcraft material."

The State's position is that the trial court did not abuse its discretion in admitting evidence of Leitner's affiliation with witchcraft. The State contends that, during the trial, the prosecutor "not only sought to show the jury that the defendant was not completely truthful in her statements to the jury, thus impeaching her, but also to put into context Michael's alleged action against the defendant on the specific instance testified to by the defendant." Additionally, the State argues that if, *arguendo*, the trial court did commit error by admitting this evidence, it constituted harmless error.

A. Abuse of discretion.

Except as otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f); *State v. Galloway*, 268 Kan. 682, 686, 1 P.3d 844 (2000); *Divine v. Groshong*, 235 Kan. 127, 130, 679 P.2d 700 (1984). K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact."

Leitner urges this court to consider several cases when determining whether the trial court abused its discretion when it allowed into evidence her involvement with Wicca, or witchcraft. The first is *Dawson v. Delaware*, 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992).

In that case, after a jury convicted the defendant of first-degree felony murder, a penalty hearing was conducted so that the jury could decide whether he should be sentenced to death. At the hearing, the trial court allowed the introduction of evidence of the defendant's Aryan Brotherhood tattoos during the jury's consid-

eration of aggravating and mitigating circumstances. The *Dawson* Court, extending the protection of the First Amendment to evidence introduced at a sentencing hearing, concluded:

"[T]he Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment.

"[W]e nevertheless agree [that]. . . the receipt into evidence . . . regarding his membership in the Aryan Brotherhood was constitutional error." *Dawson*, 503 U.S. at 165.

The *Dawson* Court reasoned that even if the Aryan Brotherhood espoused racist beliefs, those beliefs had no relevance to the defendant's sentencing. 503 U.S. at 166. The *Dawson* Court concluded that the defendant's "First Amendment rights were violated by the admission of the Aryan Brotherhood evidence in this case, because the evidence proved nothing more than Dawson's abstract beliefs. Cf. *Texas v. Johnson*, 491 U.S. 397, 414 (1989)." 503 U.S. at 167.

Next, Leitner cites the Nevada case of *Flanagan v. State*, 846 P.2d 1053 (Nev. 1993). In *Flanagan*, the prosecution presented details of the defendants' belief in the occult and membership in a coven to establish their bad character at a sentencing hearing. The Nevada Supreme Court affirmed the convictions, but the United States Supreme Court vacated the sentences in light of *Dawson*. On remand, the *Flanagan* court reviewed the rule set forth in *Dawson*, stating:

"The United States Supreme Court stated that evidence of constitutionally protected associations could be admissible to show that a defendant poses a future danger to society. [Citation omitted.] However, the mere fact that a defendant belongs to a group holding racist or other antisocial beliefs is insufficient. To be admissible, the constitutionally suspect evidence must somehow be 'tied' to the defendant's crime. [Citation omitted.]
. . . .
"From *Dawson*, we derive the following rule: Evidence of a constitutionally protected activity is admissible only if it is used for something more than general character evidence." 846 P.2d at 1055-56.

Leitner further cites the case of *Unites States v. Abel*, 469 U.S. 45, 83 L. Ed. 2d 450, 105 S. Ct. 465 (1984). In *Abel*, the United States Supreme Court held that under the common law of evi-

dence, the admission of evidence relating to a witness' membership in an organization may be relevant to show witness bias, *i.e.*, that his or her testimony was slanted or perhaps fabricated. 469 U.S. at 52-53.

Even though this court has not encountered a previous murder trial where evidence of a defendant's association with witchcraft was admitted into evidence, it has considered cases concerning the admission of evidence of gang affiliation. In *State v. Sims*, 265 Kan. 166, Syl. ¶ 5, 960 P.2d 1271 (1998), this court stated:

"Evidence of gang affiliation indicating a defendant is a member of a gang or is involved in gang-related activity is admissible to show a motive for an otherwise inexplicable act. Such evidence, however, is only admissible where there is sufficient proof that such membership or activity is related to the crime charged."

In another recent Kansas case involving evidence of a person's association with a gang, this court reviewed the *Dawson* case and stated:

" '*Dawson* does not stand for the position that such evidence must always be excluded. In fact, *United States v. Abel* [citation omitted] held that evidence of gang membership was probative of witness bias, and its probative value outweighed the potential for prejudice. *Dawson* does not overrule or limit *Abel*; we read *Dawson* as applying to the sentencing fact scenario.' " *State v. Roberts*, 261 Kan. 320, 325, 931 P.2d 683 (1997) (quoting *State v. Tran*, 252 Kan. 494, 503-04, 847 P.2d 680 [1993]).

Thus, although there is no per se barrier to the introduction of evidence of a person's membership or participation in a religious group or association, to be admissible such evidence should be related to the commission of the crime charged or should be used to show a person's possible bias or motive. See *Dawson*, 503 U.S. at 168; *Abel*, 469 U.S. at 52-53; *Sims*, 265 Kan. 166, Syl. ¶ 5; *Roberts*, 261 Kan. 320, Syl. ¶ 1.

1. Relevancy, Impeachment.

" ' "The determination of relevancy is a matter of logic and experience, not a matter of law. [Citations omitted.]" ' " *State v. Gardner*, 264 Kan. 95, 104, 955 P.2d 1199 (1998). To establish relevancy to the fact of the crimes charged, this court has stated there must be "some natural or logical connection between [the witness'] testimony and the inference or result [the witness'] tes-

timony is designed to establish." *State v. Donesay*, 265 Kan. 60, 85, 959 P.2d 862 (1998). Here, the evidence showing that Leitner participated in Wicca bears no relevance to the crimes charged against her. The record contains no hint or innuendo that her abstract beliefs had any connection to Leitner killing Michael.

Further, the State's assertions that it sought to use this evidence to put Michael's actions into context or to impeach Leitner's testimony about the indiscriminate nature of Michael's abuse are ludicrous. To believe these assertions, one must first believe that a justification exists for beating one's spouse. The State fails to present a valid justification for its argument that Leitner's testimony describing Michael's physical abuse "opened the door" to collateral evidence of Leitner's association with Wicca.

2. Probative value versus prejudicial effect.

The State further asserts on appeal that the evidence of Leitner's involvement with witchcraft was more probative than prejudicial. K.S.A. 60-445 states:

> "Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

While K.S.A. 60-445 only refers to the element of surprise, as a rule of necessity the trial judge may exclude any evidence which may unfairly prejudice the jury against the defendant. See *State v. Davis*, 213 Kan. 54, 57, 515 P.2d 802 (1973). Where the probative value is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. See *Curry v. Klein*, 251 Kan. 670, 675, 840 P.2d 443 (1992).

On cross-examination, the prosecutor succeeded in getting Leitner to admit that she was involved in witchcraft and attended at least one pagan ceremony. As noted, however, the evidence failed to show Leitner's bias or motivation for killing Michael and was not relevant to the commission of the crime charged. Thus, it had no probative value.

As to the possible prejudice generated, the idea of witchcraft has generated terror and contempt throughout American history. Be-

fore this country was formed, the first laws of the Massachusetts Bay Colony listed idolatry and witchcraft among capital offenses. See *Furman v. Georgia*, 408 U.S. 238, 335, 33 L. Ed. 2d. 346, 92 S. Ct. 2726 (1972) (Marshall, J., concurring).

Even in our culture today, satanic imagery associated with witchcraft continues. For example, in *Altman v. Bedford Cent. School Dist.*, 245 F.3d 49 (2d Cir. 2001), parents brought suit against a school district alleging that a card game played by extracurricular clubs depicting goblins, zombies, and vampires glorified the worship of Satan and the practice of witchcraft. In another recent case, two young children were taken from their parents by social workers for 2½ months after the mother's sister, who suffered from a severe psychiatric disorder, told tales of Satanic worship and falsely reported that the father might sacrifice his son to Satan at the fall equinox ritual. *Wallis by and through Wallis v. Spencer*, 193 F.3d 1054 (9th Cir. 1999). It seems evident that our culture associates witchcraft with Satanic worship and other evil practices. Any mention of a defendant's involvement with witchcraft is highly prejudicial.

Therefore, because the evidence of Leitner's practice of witchcraft was more prejudicial than probative, had no direct relevance to the crime charged, and did not serve to impeach Leitner, no reasonable person would take the view adopted by the trial court in admitting evidence of Leitner's participation in witchcraft. The decision to admit this evidence at trial was in error.

B. Constitutional Error, Harmless Error.

"An appellate court's review of the trial court's admission of evidence is a two-step process. First, it must determine whether the evidence was admissible or inadmissible. Then, if the evidence was improperly admitted, it must determine whether to apply the harmless error rule of review or the federal constitutional error rule to the erroneous admission of that evidence." *State v. Smallwood*, 264 Kan. 69, 80-81, 955 P.2d 1209 (1998).

"Review of the admission or the exclusion of evidence is usually governed by the harmless error rule. K.S.A. 60-261 provides that no error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not

affect the substantial rights of the parties. *State v. Morris*, 255 Kan. 964, Syl. ¶ 6, 880 P.2d 1244 (1994).

"Under the federal constitutional error rule, an error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. McClanahan*, 259 Kan. 86, Syl. ¶ 4, 910 P.2d 193 (1996)." *State v. Clark*, 261 Kan. 460, 469, 931 P.2d 664 (1997).

Recently, in the case of *Pham*, the Kansas Court of Appeals considered the erroneous admission of the defendant's gang affiliation during his trial on nongang-related crimes. In that case, the Court of Appeals found that where inflammatory evidence has no probative value of significant magnitude to counterbalance its prejudicial effect, its introduction becomes grossly and unfairly prejudicial. 27 Kan. App. 2d at 1002. There, because the evidence against the defendant was "far from overwhelming," the court held that cumulative trial errors merited reversal and a new trial. 27 Kan. App. 2d at 1006.

We must consider whether the admission of evidence that Leitner was involved in witchcraft constituted reversible error. In this particular case, overwhelming evidence was presented concerning Leitner's steadfast desire to kill Michael. Moreover, ample evidence illustrated Leitner's belief that she and her boys would be better off financially if Michael were dead. At trial, Leitner did not dispute that she intentionally shot Michael. The issue was whether she acted in self-defense or with premeditation. Leitner's intent was a key factor for the jury to decide.

Leitner testified that she made two previous attempts to kill Michael by poisoning him. She expressed to her brother, her sister, and her babysitter a continuing desire to be rid of Michael permanently for the sake of her family. Although she owned two guns of her own, she took two guns belonging to others with her the night she shot Michael. She wore gloves to hide her fingerprints. She told her sister-in-law that she asked Michael to come to Toronto with her to work things out. Leitner also told her that she walked up behind Michael and shot him in the head, then twice again in the temple as he laid on the ground to make sure he was

dead. The expert opinion of Dr. Mitchell supports Pam's testimony. Leitner had stopped earlier at a rest stop for the purpose of killing Michael by shooting him, which makes premeditation clear. Here, overwhelming evidence contradicts Leitner's story of self-defense on the night of the murder.

While in a close case, the admission of evidence of a defendant's participation in Wicca might serve to inflame a jury to wrongfully convict a defendant and result in a reversal on appeal, it is clear in this case that the jury heard ample evidence to show that Leitner murdered her husband with premeditation. Therefore, based on the particular facts of this case alone, we decline to set aside the jury verdict based on the erroneous admission of witchcraft evidence.

## II. AGENT HALVORSEN'S TESTIMONY CONCERNING THE NONINVOLVEMENT OF GARY HOCKETT

On appeal, Leitner asserts that the trial court erred when it allowed KBI agent Bill Halvorsen to testify that Gary Hockett "was telling the truth." Halvorsen is a special agent with the KBI, assigned to the general felony investigations unit. Halvorsen assisted in the investigation of Michael's homicide. Leitner states that Halvorsen served "as a sort of expert," noting that he was permitted to observe the testimony of other witnesses throughout the trial prior to his testimony.

Expert opinion testimony is admissible if it aids the jury with unfamiliar subjects or interpreting technical facts or if it assists the jury in arriving at a reasonable factual conclusion from the evidence. Necessity is the basis for the admission of expert testimony, arising out of the particular circumstances of the case. Expert conclusions or opinions are not necessary if the normal experience and qualifications of jurors permit them to draw proper conclusions from the given facts and circumstances. *Smallwood,* 264 Kan. at 80. "An expert's opinion, pursuant to K.S.A. 60-456, is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. An expert witness may not pass on the weight or credibility of evidence." *State v. Rice,* 261 Kan. 567, Syl. ¶ 10,

932 P.2d 981 (1997). An expert may testify and give his or her opinion concerning the ultimate issue of the case; however, such testimony is admissible only if it actually assists the jury. *State v. Gaines*, 260 Kan. 752, 757, 926 P.2d 641 (1996).

"No error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Smallwood*, 264 Kan. at 80 (citing K.S.A. 60-261; *State v. Morris*, 255 Kan. 964, Syl. ¶ 6, 880 P.2d 1244 [1994]).

In particular, Leitner objects to the following testimony:

"Q. At some point after Gary Hockett's interview that day to today's date were you ever able to positively confirm that Gary Hockett was not involved prior or during the murder of Michael Leitner?

"MR. CLARK: I guess I'm going to object, your Honor. That's one of the ultimate issues that the jury's going to have to decide, and I don't think it's proper for this witness to render an opinion as to credibility of witnesses. That's the ultimate issue.

"THE COURT: Not in this trial. You may repeat the question if you wish. You can answer.

"Q. Were you ever able after the interview of Gary Hockett on October 22nd, the five or six hour interview, ever able to absolutely positively confirm that Gary Hockett was not involved prior to or during the murder of Michael Leitner?

"A. Yes, I was."

At trial in her opening statement, Leitner's theory of defense was that she intentionally shot Michael in self-defense. Upon direct examination, Leitner first stated that Gary encouraged her to take the guns with her and even loaded them for her while she went to the liquor store. Later, during cross-examination, Leitner testified that Gary did not know what she was going to do with the guns or that she was going to commit a crime on the night of the murder. In closing argument, defense counsel argued that Gary was not telling the truth when he testified that he did not give Leitner the two guns that evening. In addition, counsel for Leitner asserted that Pam and Gary lied in order to keep Gary from being prosecuted for his involvement in Michael's murder. The inference de-

fense counsel asked the jury to draw was that if Pam and Gary lied, Leitner's story of self-defense would be more probable.

Leitner's theory that the trial court's admission of Halvorsen's testimony was in error because it touched on the ultimate issue of premeditation fails for two reasons. First, when considering whether Leitner committed the murder with premeditation, it makes no difference whether jurors chose to believe either Gary or Leitner. Even if Gary gave Leitner two guns for her protection that Friday night, as Leitner testified, reasonable jurors could conclude that she formed the requisite premeditation during her 2-hour drive to Olathe. " 'Premeditation under the law does not require any specific time frame.' [Citation omitted.]" *State v. Moncla*, 262 Kan. 58, 72, 936 P.2d 727 (1997). Furthermore, a jury " 'has a right to infer premeditation from the established circumstances of the case provided the inference is a reasonable one.' " *State v. Murillo*, 269 Kan. 281, 286, 7 P.3d 264 (2000). Thus, the fact that Gary's story varied from Leitner's makes no difference as to the issue of premeditation.

Second, the State's inquiry did not concern Gary's credibility during the trial; rather the question was designed to elicit a response from Halvorsen as to whether his investigation confirmed the truth of Gary's story of noninvolvement prior to or during the murder. This information is helpful to a jury, and, thus, the trial court did not abuse its discretion when it allowed Halvorsen to testify. Moreover, Leitner's own testimony confirmed that Gary was not involved prior to or during the murder. Thus, Leitner suffered no prejudice from Halvorsen's testimony, and her claim of error is without merit.

## III. ALLEGED PROSECUTORIAL MISCONDUCT

The next issue for consideration is whether Leitner was denied due process and a fair trial because of alleged persistent prosecutorial misconduct. According to Leitner, the prosecutor committed misconduct by (1) deliberately injecting evidence of her involvement with witchcraft; (2) making argumentative remarks about holding the gun; and (3) conducting an improper coerced reenactment of the shooting during cross-examination. In addition,

Leitner contends that these multiple instances of prosecutorial misconduct substantially prejudiced her right to a fair trial.

"Not every trial error or infirmity which might call for application of an appellate court's supervisory powers correspondingly constitutes a failure to observe the fundamental fairness that is essential to the very concept of justice." *State v. Ruff*, 252 Kan. 625, 631, 847 P.2d 1258 (1993). "Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial." *State v. Pabst*, 268 Kan. 501, 504, 996 P.2d 321 (2000) (citing *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 [1999]).

" 'Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error.' " *State v. Lumley*, 266 Kan. 939, 965, 976 P.2d 486 (1999) (citing *United States v. Grunberger*, 431 F.2d 1062 [2d Cir. 1970]). This court analyzes the prosecutor's conduct during cross-examination using a standard similar to that used when reviewing remarks made in closing argument. "Specifically, '[i]n deciding the question of whether prosecutorial misconduct requires reversal, an appellate court determines whether there was little or no likelihood the error changed the result of the trial.' " 266 Kan. at 959.

A. Witchcraft evidence.

In *State v. Lockhart*, 24 Kan. App. 2d 488, 947 P.2d 461 (1997), the court lists the following factors for consideration when determining whether prosecutorial misconduct was prejudicial:

" ' "When determining whether prosecutorial misconduct was prejudicial, factors that should be considered include: (1) Is the misconduct so gross and flagrant as to deny the accused a fair trial? (2) Do the remarks show ill will on the prosecutor's part? (3) Is the evidence against the defendant of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors? [Citations omitted.]" ' " 24 Kan. App. 2d at 492.

As discussed previously, the admission of the witchcraft evidence constituted error; however, even though the prosecutor should have avoided the introduction of irrelevant evidence of witchcraft, the prosecutor's remark following the objection does not demon-

strate ill will or gross misconduct. Looking closely at the record, the prosecutor was not asking Leitner a question following the trial court's admonition but rather was responding to the court. Moreover, Leitner's response following the prosecutor's remark was not required of her.

This particular remark by the prosecutor, even if erroneous, had little or no likelihood of changing the result of the trial due to the overwhelming evidence against Leitner. When viewed in the light of the trial record as a whole, the complained-of conduct does not mandate a reversal.

B. Prosecutor's remarks about holding the gun.

Next, we consider whether the prosecutor's remarks to Leitner during cross-examination concerning her knowledge of how to hold a gun were so prejudicial as to require reversal. An examination of the trial record reveals the following exchange:

"Q.   Was the .380—were you still pointing it?
"A.   I don't remember.
"Q.   Well, take the .22 then and show the jury how you were standing when you fired the .22 and how you were pointing it. Go ahead, pick it up. Go ahead and stand up, do the same thing, turn around, face the wall so it doesn't point at anybody.
"A.   What do you want me to do with it?
."Q.   Demonstrate how you shot the .22, what you were doing with the gun. Hold it like you fired it. Ma'am, you know how to hold the gun.
"A.   (Witness complies with request.)"

Here, Leitner asserts that the most egregious remark occurred when the prosecutor stated, "Hold it like you fired it. Ma'am, you know how to hold the gun." Again, Leitner contends that this remark was motivated by nothing but ill will. Leitner compares this exchange with remarks made by the prosecutor in *State v. Gray*, 25 Kan. App. 2d 83, 958 P.2d 37 (1998).

The comparison is unconvincing. In *Gray*, the defendant denied ownership of drug paraphernalia, including spoons and syringes, during cross-examination. The defendant further denied using intravenous drugs since a month and a half before a search warrant was executed. In response, the prosecutor told the defendant to show his arms. When the defendant complied, his arms apparently

revealed no evidence of intravenous drug use, and the prosecutor stated to the jury: "Sure saw a lot more on the day we arrested you." 25 Kan. App. 2d at 85. There, the prosecutor's remarks, in essence, interjected a new, prejudicial assertion of unproven fact to the jury, *i.e.*, that there were needle marks on the defendant's arms on the day of his arrest. Here, however, the prosecutor did not interject any new assertions of unproven fact. Jurors knew that Leitner had fired the gun, because she previously admitted that she fired the weapon into Michael's head. In addition, jurors knew that Leitner knew how to hold a gun because Gary Hockett testified that on September 4, 1998, he and Leitner had engaged in target practice with pistols behind the shop on her property.

The record provides no evidence that the prosecutor's remark was motivated by ill will. Viewed in the light of the entire trial record, the complained-of conduct does not require a reversal.

C. Reenactment of the shooting on cross-examination.

Next, we consider whether the prosecutor's reenactment of the shooting substantially prejudiced Leitner. On appeal, Leitner argues that the reenactment during cross-examination was improper because (1) it was outside the scope of direct examination; (2) it constituted a form of compelled testimony in violation of the Fifth Amendment privilege against self-incrimination; and (3) because Halvorsen's actions in playing the role of Michael misstated the evidence.

1. Reenactment on cross does not exceed the scope of direct examination.

At trial, counsel for Leitner objected once during the demonstration, but it was an objection on the basis that the question had been answered several times, not an objection to the demonstration itself. "The erroneous admission of evidence may not be raised on appeal absent a timely objection to the evidence, so stated as to make clear the specific ground of the objection. K.S.A. 60-404." *State v. Sutton*, 256 Kan. 913, 924, 889 P.2d 755 (1995).

Even if counsel for Leitner lodged an appropriate objection at trial, her argument that the reenactment exceeded the scope of direct examination would fail. Courtroom demonstrations upon cross-examination of a defendant were ruled permissible in Kansas

courts under *State v. Egbert*, 227 Kan. 266, 270, 606 P.2d 1022 (1980). In *Egbert*, this court found that asking the defendant to demonstrate to the jury on cross-examination how he contended the victim was shot does not exceed the scope of direct examination. 227 Kan. at 270.

2. Reenactment does not violate Fifth Amendment.

We next turn to Leitner's contention that the demonstration was a form of compelled testimony. Leitner cites *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967), as authority for the proposition that the demonstration constituted an impermissible form of compelled self-incrimination.

Because the reenactment was not purely testimonial in nature, no violation of the Fifth Amendment privilege against self-incrimination occurred. The case cited by Leitner bears out this idea. In *Gilbert*, the Court noted that the Fifth Amendment privilege against self-incrimination only reaches "compulsion of 'an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers,' and not 'compulsion which makes a suspect or accused the source of "real or physical evidence" . . . .' " 388 U.S. at 266 (quoting *Schmerber v. California*, 384 U.S. 757, 763-764, 16 L. Ed. 2d 908, 86 S. Ct. 1826 [1966]).

On this issue, *Egbert* is controlling. In that case, this court held that a reenactment by the defendant on cross-examination "did not violate [defendant's] constitutional guarantee against self-incrimination." 227 Kan. at 270. Thus, Leitner's argument fails.

3. Reenactment did not impermissibly misstate the evidence.

Next, we consider whether the demonstration was improper because it misstated the evidence. Following the initial demonstration, a recess was held. Thereafter, the prosecutor turned to the subject of the reenactment and asked Leitner questions concerning where she stepped when she shot Michael for the second time. After a brief exchange, Leitner's counsel objected, stating: "State's already gone over this. It's been asked and answered." The court responded: "Well I think some clarification's in line." At that point, counsel for Leitner objected on the ground that the demonstration

misstated the evidence because "during the representation, Agent Halvorsen indicated that he fell forward. The evidence is that Mr. Leitner actually fell backwards . . . ." The trial court overruled the objection, stating: "Well, I understood the demonstration was to give her an opportunity to show exactly where he was and what happened, and if she allowed things to be out of place then you'll have to clarify that on redirect I guess."

Leitner contends that misstating the facts in evidence is clearly improper under *Pabst*, 268 Kan. at 507. *Pabst* involved a prosecutor who gave his personal opinion of the defendant's credibility to the jury during closing argument. While it is true that a prosecutor cannot interject his opinion of the defendant's veracity, Leitner's argument on appeal fails to convince us that the courtroom demonstration in this case constituted a misstatement of the evidence by the prosecutor.

Finally, we conclude that neither the prosecutor's conduct nor the reenactment during cross-examination substantially prejudiced Leitner's right to a fair trial.

## IV. LIMITATION OF CROSS-EXAMINATION OF THE STATE'S WITNESSES TO THE SCOPE OF DIRECT EXAMINATION

The last issue for consideration is Leitner's contention that the trial court denied her fundamental right to present a defense when it placed limitations on her ability to introduce evidence regarding her discordant marital relationship and specific instances of past physical abuse. More specifically, Leitner complains that the court erred when it ruled she could elicit evidence of specific instances of Michael's physical abuse only in her case in chief, rather than being allowed to elicit such information from the State's witnesses, Gary Hockett and Tammy Warner, on cross-examination. Leitner asserts that such evidence should have been allowed under the judicial marital homicide exception to K.S.A. 2000 Supp. 60-460 originally crafted in *State v. Taylor*, 234 Kan. 401, 408, 673 P.2d 1140 (1983). Leitner concludes that the trial court's actions denied her the right to confront witnesses and limited her ability to present

a defense. Therefore, she contends that the trial court committed reversible error.

"The Confrontation Clause of the Sixth Amendment to the United States Constitution affords an accused the right to cross-examination. The United States Supreme Court has 'recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' *Davis v. Alaska*, 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). The district court's decision . . . concerning the scope of cross-examination is reviewed under the abuse of discretion standard. [Citation omitted.]" *State v. Albright*, 271 Kan. 546, 550, 24 P.3d 103 (2001).

"A judge . . . has broad discretion to control examination and 'reviewing courts will not interfere unless discretion has been abused.' " *State v. Mitchell*, 234 Kan. 185, 188, 672 P.2d 1 (1983). "The appropriate standard of review is not one of constitutional error, but whether the trial judge abused her discretion." *State v. Lyons*, 266 Kan. 591, 601-02, 973 P.2d 794 (1999).

Prior to trial, a motion in limine was filed by the State, which sought to limit the introduction of specific instances of Michael's misconduct. The State asserted that since self-defense was an issue in the case, evidence of Michael's turbulent character was admissible if confined to evidence of his general reputation in the community. The State asserted that language in *State v. Deavers*, 252 Kan. 149, 156-57, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993), provided authority for its requested motion in limine:

"Where self-defense is an issue in a homicide case, evidence of the turbulent character of the deceased is admissible. Such evidence may consist of the general reputation of the deceased in the community, but specific instances of misconduct may be shown only by evidence of a conviction of a crime." 252 Kan. at 156-57.

In her response to the State's motion, Leitner relied upon *Lumley* for the proposition that evidence of specific instances of the Michael's misconduct could be introduced under the "marital homicide exception." In *Lumley*, this court reiterated the marital homicide exception first set forth in *Taylor*:

" 'Evidence of prior acts between a defendant and a victim are admissible independent of K.S.A. 60-455 if the evidence is to establish the relationship between the parties, the existence of a continuing course of conduct between the parties,

or to corroborate the testimony of the complaining witness as to the act charged. Cases have allowed prior conduct to be admitted into evidence where a family relationship existed.' 234 Kan. at 407." *Lumley*, 266 Kan. at 954.

The trial court held a pretrial hearing on the motion but did not rule on the issue at that time. On August 25, 1999, the third day of trial, the issue was revisited.

Counsel for Leitner twice requested permission to cross-examine a witness called by the State about specific incidents when Michael physically abused Leitner during their marriage. First, he asked to cross-examine Tammy Warner about evidence of marital discord between Leitner and Michael. The State indicated it would call Warner to testify regarding her conversation with Leitner in which Leitner threatened to kill Michael less than a month before the murder. The trial court sent the jury outside the courtroom and heard Warner's proffered testimony of her personal knowledge of physical violence between Michael and Leitner. Warner testified that although she had not witnessed the fight, she had personally seen Leitner with a black eye and that both Michael and Leitner told her how it happened. The court ruled that the proffered evidence would be outside the scope of the State's proposed direct examination, in that evidence allegedly showing her hatred towards the defendant was not the same as marital discord: "The relationship has changed. She's no longer married to the defendant."

Later in the trial, counsel for Leitner approached the court prior to the direct examination of Gary seeking to elicit on cross-examination his "general knowledge of the violent nature of the relationship . . . ." The trial court indicated that the permissiveness of the inquiry was dependent on the scope of his direct examination by the State, declaring: "His response to that subject matter's going to determine whether it might open some doors or not."

At trial, opposing counsel argued over whether defense counsel could inquire on cross-examination about specific instances of violent behavior for the reason that evidence of the relationship between the deceased and the accused is generally admissible.

"We have addressed the issue of relevance of evidence of a discordant relationship between a defendant and a victim in numerous cases and have held that admission of evidence of a discordant relationship is admissible independent of

K.S.A. 60-455 and relevant to show the ongoing relationship between the parties, the existence of a continuing course of conduct, or to corroborate the testimony of witnesses as to the act charged. See *State v. Hedger*, 248 Kan. 815, 820, 811 P.2d 1170 (1991); *State v. Taylor*, 234 Kan. at 407; *State v. Green*, 232 Kan. 116, Syl. ¶ 4, 652 P.2d 697 (1982). In *Hedger*, we also discussed the remoteness of such evidence and held that any lapse of time between the acts described in the trial testimony and the acts alleged does not preclude the admission of evidence relative to motive and intent, but only goes to the weight to be given the evidence. 248 Kan. at 820 (citing *State v. Green*, 232 Kan. 116, Syl. ¶ 5)." *State v. Clark*, 261 Kan. 460, 470, 931 P.2d 664 (1997).

Through her own testimony, Leitner was able to present evidence of approximately 70 acts of abuse against her by Michael. An instruction on self-defense was given to the jury. Leitner indicated she shared stories of the abuse with her sister, Tammy Warner. The trial court offered to extend the out-of-state subpoena of Warner so that Leitner could call her as a witness in her case in chief, but Leitner declined to do so. Leitner called Gary to the stand, and he testified that Leitner told him Michael had slapped her during fights, but Gary had never seen Michael hit Leitner.

Here, the core issue is not whether evidence of Leitner and Michael's discordant relationship was admissible, but rather whether the judge's limitation of the cross-examination of witnesses to the scope of direct examination constituted an abuse of discretion. Because Leitner was given the opportunity to present evidence of marital discord during her own case in chief, the trial court's limitation of the cross-examination of witnesses Gary and Warner to the scope of direct examination was reasonable. Under the facts of this case, the trial court did not abuse its discretion.

Affirmed.