2006 OK CR 29

**Laura L. DUNKLE, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2004–621.**

Court of Criminal Appeals of Oklahoma.

July 7, 2006.

Douglas J. Smith, Norman, OK, attorney for defendant at trial.

Lesley March, Assistant District Attorney, Robert E. Christian, District Attorney, Chickasha, OK, attorney for the State at trial.

Jamie D. Pybas, Appellate Defense Counsel, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Donald D. Self, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### *OPINION*

CHAPEL, Presiding Judge.

¶ 1 Laura L. Dunkle was tried by jury and convicted of First–Degree Murder, under 21 O.S.2001, § 701.7, in Grady County, Case No. CF–2003–147. In accordance with the jury's recommendation, the Honorable Richard G. Van Dyck sentenced Dunkle to life imprisonment without the possibility of parole. Dunkle appeals her conviction and her sentence.

¶ 2 Gary Benton White, age 46, was killed by a single gunshot wound to the chest, shortly after midnight on May 6, 2003, just outside the home he was sharing with his fiancée, Laura Dunkle, in Dibble, Oklahoma. Dunkle gave various statements at the scene and later that morning about what happened. She consistently denied shooting White, maintaining instead that he either shot himself or that he was shot accidentally as she attempted to prevent him from shooting himself.

¶ 3 Shortly after midnight on the morning of May 6, 2003, Dunkle frantically called her friend, Lois Merrel, asking her to call 911 and get an ambulance, because there had been an accident and Gary had been shot. Merrel testified that Dunkle said that she had tried 911 herself and could not get through.[1] Merrel also testified that Dunkle referred to Gary having a gun in his hand, a cigarette in his mouth, and carrying his lunch pail as he headed toward his truck to go to work, when he stumbled on the wobbly back steps and accidentally shot himself.[2] Merrell called 911 and later went to Dunkle's home.

¶ 4 Sergeant Tommy Payne, of the Grady County Sheriff's Office, was the first to arrive at the scene. He testified that Dunkle flagged him down and led him to where Gary White was laying flat on his back, with his

---

1. A call was placed to 911 from Dunkle's residence early that morning, but when the 911 operator answered, she did not get a response on the line and assumed the caller had hung up.

2. Merrel acknowledged on cross examination that in her written statement, she described Dunkle as referring to simply a "gun accident," without any of the details about White carrying things and heading to his truck and stumbling.

feet toward the back steps of the trailer home, with a single gunshot wound to his chest. Payne could not get a pulse and believed White was dead.[3] When asked what had happened, Dunkle stated, "He shot himself." When asked where the gun was, Dunkle stated, "It's around here somewhere." Payne then located the gun, a Colt .45 caliber semi-automatic pistol, behind where Dunkle was standing, near the foot of the steps of the home and over five feet and to the left of White's left foot. The gun was chambered and cocked in the firing position.[4]

¶ 5 When Payne asked Dunkle where it had happened, she responded, "In the kitchen." When he entered the home, Payne noticed a .45 caliber shell casing laying in the threshold of the doorway leading to the steps. On an island in the kitchen, Payne discovered a small, open suitcase containing other guns. There was no sign of a struggle or blood inside the kitchen. At that point Corporal John Foster, of the Grady County Sheriff's Office, arrived and accompanied Dunkle over to his patrol car, where he asked her what happened.

¶ 6 Dunkle told Foster that she had awakened her boyfriend, Gary White, around 10:00 p.m., so that he could get ready for work. She stated that she made coffee and did the dishes and that they talked about their future plans. Dunkle stated that she told White she was going to go lay down in the bedroom of her two sleeping sons, which she did. Dunkle stated that she later saw White in the hallway outside the bedroom door, carrying the small attaché case in which he kept his guns, and that he said something she couldn't understand. Dunkle stated that she got up and followed him into the kitchen, because she had a feeling something bad was going to happen.

¶ 7 Dunkle stated that White had his gun case open on the kitchen island and was trying to load the gun. Dunkle stated that she said, "No, don't you do that," and tried to get the gun away from him, but he pushed her down. She stated that as she got up, White went out the back door and down the steps, and she saw a flash of light, and something hit the rocks just outside the trailer when the gun went off. When asked if White was facing her when the gun went off, Dunkle stated that it was "pitch black" and she couldn't see "nothing." At this point Foster asked Dunkle if she would be willing to allow him to tape record what she was telling him, because he could not write as fast as she was speaking. Dunkle agreed to do so, and they got in Foster's patrol car, so they could record what was said.

¶ 8 The tape recording of Dunkle's subsequent conversation with Foster, along with a transcription of this recording, was entered into evidence at trial. Dunkle added a number of details to her account, including that White had to come back into the house to get something he had forgotten and that she couldn't hear what he said at the bedroom door due to noise from a fan. Dunkle added that after being shoved down on her first attempt to get the gun from White, she tried to get the gun a second time, using a maneuver she learned in a CLEET mandate class, in a struggle with White near the back door. Dunkle stated that she and White were both outside on the steps when the gun went off, and that after the flash of light, she saw White holding his sides and coughing.[5] Dunkle also talked about various other matters, including what a wonderful guy White was, how good he was with her children, how respectful he was of guns, that they were to be married on May 26, 2003, and that White was "the happiest guy in the world."[6] Dun-

---

3. Some blood spatter was found on the ground near White's left foot, but the lack of other blood at the scene (beyond that on and below the body) suggested that White stopped moving around soon after being shot.

4. The State maintained that if White had been holding the gun at the time it fired, it would have fallen somewhere closer to the right side of his body. The State maintained that White, who was right-handed, was carrying a set of keys at the time he was shot, which were found near his

right arm, and that the gun was dropped by Dunkle from her position on the stairs facing White, after she shot him at point-blank range as he approached.

5. Dunkle's recorded statement is unclear regarding whether she had any control or contact with the gun at the time it went off.

6. Dunkle's defense at trial was essentially that White was attempting to commit suicide or at least that Dunkle—who had both a brother and

kle's demeanor varied widely during the interview.

¶ 9 Foster testified that by the conclusion of this interview, he became suspicious that Dunkle could be a suspect in the shooting, due to some of the inconsistencies in her statements. Consequently, Foster asked Dunkle if she would be willing to write out her statement and then read her the printed *Miranda* warnings at the top of the voluntary statement form that he provided, listing the time as 1:15 a.m. Foster testified that Dunkle advised him that she understood her rights and that she was still willing to talk to him. Dunkle then provided a written statement, which was admitted at trial.[7]

¶ 10 Around 4:00 a.m. that morning, O.S.B.I. Special Agent Tom Linn arrived at the scene. Linn testified regarding his observations of the scene and the victim, including the presence of a set of keys laying near the outstretched right arm of White.[8] He obtained permission from Dunkle to search her home and did so. He then approach Dunkle, who was in Undersheriff Irene Perske's car, and asked if she was willing to be further interviewed by Linn and Perske

about the incident, to which Dunkle agreed. Dunkle was then taken to the OSBI office in the Grady County Law Enforcement Center by Perske, after indicating that she preferred to ride with Perske.[9] Dunkle was then interviewed extensively by Linn, while Perske remained in the room, beginning around 5:00 a.m.[10]

¶ 11 Linn acknowledged at trial that he did not read Dunkle her *Miranda* rights.[11] He testified at length about Dunkle's various statements during this interview, relying mainly on his report of the interview, which he began preparing a few days later.[12] During the interview Dunkle provided more information about her relationship with White, his job as a truck driver hauling gravel, and her children and background. She again summarized the events of the previous evening and the circumstances surrounding the shooting. Most of Dunkle's story was consistent with her earlier accounts, in particular, that she thought White was going to shoot himself.[13]

¶ 12 Linn noted, however, that in Dunkle's first version to him, she described seeing a

---

an ex-husband who committed suicide—*believed* that White was about to shoot himself. Yet Dunkle never presented any cogent explanation of why White, who witnesses consistently described as "happy-go-lucky," would want to kill himself. On the other hand, the State, which maintained that Dunkle intentionally shot White, likewise never offered any significant evidence regarding her motive for shooting her husband-to-be.

7. The written statement, though less detailed, is essentially consistent with Dunkle's tape-recorded statement.

8. Although the potential significance of these keys was emphasized at trial, the evidence presented did not establish what they were for or to whom they belonged. The evidence did establish that White's keys to his truck were found in the ignition.

9. Dunkle was barefoot and wearing a nightgown when officers arrived at the scene. She was transported and interviewed still in her nightgown, and neither Linn nor Perske could recall whether or not she was allowed to obtain any type of shoes.

10. Although Perske remained, she did not take any notes—since Linn did not ask her to take notes—and professed almost no independent recollection of what Dunkle said.

11. Although at trial Linn noted that Dunkle had already "been Mirandized," at preliminary hearing he testified that he did not Mirandize Dunkle "because she wasn't under arrest" and that she was free to leave. The State's argument in its brief that Linn did not Mirandize Dunkle "because she had already been advised of those rights," is misleading, since there is no evidence in the record that Linn was aware that Foster had Mirandized Dunkle earlier that morning.

12. Linn acknowledged that he did not record or videotape the interview, even though interview rooms equipped with recording equipment were available. He testified that in his "33 years of law enforcement and 25 years plus in the FBI," he had "never" recorded or videotaped an interview. Linn testified that he took notes, but that he destroyed these notes, in compliance with O.S.B.I. policy, after he completed his final report. Linn also testified that after completing a rough draft report, he consulted with Perske before completing the final report.

13. Dunkle noted that her ex-husband had shot himself the preceding year, that she had helped stop one of her brothers who was attempting to shoot himself with a handgun, and that another one of her brothers later did commit suicide.

flash of light after White ran down the steps, and that she thought he was having a heart attack when she saw him bending over at the waist. Linn noted that Dunkle also described laying down next to White, to talk to him while they waited for help, and that because she was feeling nervous and stressed, she removed a cigarette and lighter from his left front shirt pocket (near the gunshot wound) and smoked the cigarette as she waited.

¶ 13 Linn testified that he told Dunkle that her account was inconsistent with evidence at the scene and that she then "revised" her story. Linn testified that Dunkle provided more details in this second account, including the placement of White's hands and her hands on the gun at the time it fired—even getting Dunkle to demonstrate the specific placement of their hands on a wooden replica of a revolver. Linn testified that Dunkle stated, "I don't remember taking control of the gun and shooting him by touching the trigger. The gun fired by accident. It was an accident." Linn testified that in this version Dunkle stated that White was on the bottom step when the gun fired, though shortly thereafter Dunkle provided another version of the story, in which she was on the top step and White was on the ground when the gun fired.

¶ 14 Linn testified that he continued to insist that Dunkle's account didn't match the scene and to push for more details, until Dunkle stated, shortly before 8:00 a.m., that she would give them more details after she asked an attorney one question. At this point they stopped interviewing her and made a number of attempts to contact attorneys. At 8:51 a.m., attorney Greg McCracken returned one of their calls, and Dunkle spoke to him on the phone, after telling the officers that they could remain in the room. During this call Dunkle told McCracken that her boyfriend had been shot and that the officers were threatening to charge her with first-degree murder if she did not confess to shooting him, even though (Dunkle insisted) she did not shoot him.

¶ 15 After speaking with Dunkle, McCracken asked to speak with Linn and inquired whether Dunkle was under arrest, to which Linn replied, "No." McCracken then asked whether Dunkle was free to leave, to which Linn responded that she was free to leave, but they would have to make some arrangements. When McCracken inquired whether Dunkle was ready to go then, Linn noted that they were "taking that under advisement" and that they would have to consult with the district attorney's office. McCracken informed Linn that he had instructed Dunkle to discontinue the interview, which was done. Shortly thereafter Dunkle was arrested and taken into custody.

¶ 16 The State established that Agent Linn, the lead investigator in the case, was a firearms expert and particularly familiar with the type of gun used to shoot White.[14] Linn testified in great detail about the functioning of the semi-automatic pistol found at the scene, including the various safety mechanisms intended to prevent accidental firings. Linn also described how improper handling of the weapon would prevent it from cycling properly. Linn testified that if the victim and Dunkle's hands were positioned as Dunkle had demonstrated at the time the gun fired, the gun would not have properly cycled *and* the victim's hands would have been injured.[15] Evidence from the scene established that the gun found on the ground had properly cycled and was cocked and ready to be fired again. White's hands were not injured.[16]

¶ 17 The medical examiner, Jeffrey Gofton, testified that the bullet that killed White traveled from front to back, slightly down-

14. Linn noted that the .45 caliber semi-automatic pistol was his "favorite handgun."

15. Linn testified: "And I can say this with authority. If someone is holding that weapon improperly, it will cut that person's hand severely."

16. On cross-examination, Agent Linn acknowledged that Dunkle's fingerprints were not found on the gun, that the State failed to perform a gunshot residue test on either Dunkle or White (to determine whether either of them was in close proximity to the gun at the time it fired), that there was no DNA evidence in the case, and that they never found the bullet that killed White, which would have helped establish the relative positions of White and the gun at the time it fired.

ward and to the left, passing directly through White's heart and exiting his back. Based upon the stippling around the entrance wound, Gofton testified that the bullet was fired from an intermediate distance, which he described as a range from several millimeters up to three or four feet. Gofton also testified that it was "extremely rare" for someone committing suicide using a handgun to fire the weapon from an intermediate distance, since such suicides typically involve contact wounds.[17] Gordon Robertson, an O.S.B.I. senior criminalist, testified that based upon his comparison of powder patterns caused by test-firing the gun recovered at the scene with the powder pattern on White's shirt, the gun was fired at a distance of less than 18 inches away from the shirt.[18] Other evidence presented at trial will be discussed in relevant propositions of error.

 ¶ 18 In Proposition I, Dunkle argues that the evidence presented at trial was insufficient to convict her of first-degree malice murder. Such challenges are evaluated under the well-established standard laid out by the Supreme Court in *Jackson v. Virginia*[19] and by this Court in *Spuehler v. State*.[20] Under this test we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt."[21] Upon reviewing the totality of the evidence presented at trial, we

conclude that the evidence was sufficient to convict Dunkle of first-degree malice murder. The jury could have chosen to believe Dunkle's story that White either shot himself or was shot accidentally, but it did not do so. The jury was entitled to draw the conclusion that it apparently did, *i.e.,* that Dunkle's inconsistent statements about how White was shot were the result of her ineffectual attempts to hide the truth that she intentionally shot him herself. The evidence presented at trial, though contested, was sufficient to support the jury's finding of guilt.[22]

¶ 19 In Proposition II, Dunkle argues that her statements to OSBI Agent Tom Linn should have been suppressed, because he did not properly advise her of her *Miranda* rights.[23] Linn has acknowledged that he never informed Dunkle of her *Miranda* rights. The State's response to this challenge is as follows: (1) Dunkle waived this issue by failing to renew her objection to Linn's testimony at trial; (2) *Miranda* warnings were not required, as the Linn interview was not a custodial interrogation; and (3) the earlier *Miranda* warnings given by Officer Foster adequately apprised Dunkle of her rights regarding the questioning by Linn.

 ¶ 20 We agree that Dunkle waived all but plain error regarding this claim, when she failed to renew her objection to Linn's

**17.** Gofton defined "contact wound" injuries to include the range from the muzzle of the gun actually touching the victim up to several millimeters away.

**18.** Robertson testified that based upon the gunshot powder patterns on White's shirt, the firing distance would be "from contact to 18 inches." He testified that it "was not a contact wound because of the powder dispersement around the wound," but also noted that "there was some tearing and large holes in the shirt that can be made with a contact-type wound." Robertson acknowledged, "we don't know" how far away the gun was, but concluded that the muzzle of the gun was "farther away than contact, . . . but less than 18 inches from the shirt."

**19.** 443 U.S. 307, 319–20, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

**20.** 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04.

**21.** *Jackson,* 443 U.S. at 319–20, 99 S.Ct. at 2789, (emphasis in original); *Spuehler,* 1985 OK CR 132, ¶ 7, 709 P.2d at 203–04 (quoting Jackson).

**22.** Dunkle's jury was instructed according to the former "reasonable hypothesis" uniform instruction for cases involving circumstantial evidence, which was abolished by this Court in *Easlick v. State,* 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559. Thus Dunkle had the benefit of this special instruction, with its seemingly higher conviction standard for cases relying on circumstantial evidence. We conclude that whether we review Dunkle's sufficiency of the evidence challenge under the "unified approach" adopted in *Easlick, id.* at ¶ 4, 90 P.3d at 557, *or* under our pre-*Easlick* jurisprudence, the challenge fails.

**23.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Dunkle's pre-trial motion to suppress her statements on this basis was overruled by the trial court.

testimony at trial.[24] We decline to determine whether Linn's interrogation of Dunkle was from the outset or became at some point "custodial," such that *Miranda* warnings were required.[25] Instead, we find that the earlier *Miranda* warnings provided by Foster adequately informed Dunkle of her rights regarding her later interrogation by Linn.[26]

¶ 21 Dunkle makes the interesting argument that she was not in custody at the time Foster interviewed her; hence his precautionary and "wholly gratuitous" *Miranda* warnings were essentially too early, and therefore did not "count" in regard to her later custodial interrogation by Linn. Dunkle relies upon a Supreme Court and an opinion by the West Virginia Supreme Court in support of this claim.[27] The discussions in these cases are inapposite.[28]

■ ¶ 22 Dunkle was Mirandized by one law enforcement officer (Foster) in connection with specific questioning about the shooting death of her husband. Less than four hours later, another law enforcement officer (Linn) began questioning her about the same shooting. Dunkle remained in the presence of law enforcement officers during this entire period. She was certainly aware that the officers were investigating the shooting of her husband and that they were focused upon determining how it had occurred and what role she might have played. This situation is entirely unlike the scenarios in the cited authorities. In addition, the fact that Dunkle asked to speak to an attorney strongly suggests that she was aware of her right to do so. Hence there was no plain error.

¶ 23 We do not, however, condone Officer Linn's apparently purposeful decision not to Mirandize Dunkle. The record does not support the State's claim that Linn was aware of

24. *See Wilson v. State*, 1998 OK CR 73, ¶ 64, 983 P.2d 448, 464. Although Dunkle filed a reply brief, she did not respond to any of the State's arguments regarding Proposition II.

25. *See Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (determine whether defendant was "in custody" under *Miranda* by evaluating whether "reasonable person" facing the same factual circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave"); *Stansbury v. California*, 511 U.S. 318, 320, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994) ("In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' ") (all citations omitted). We note that Linn did not inform Dunkle that she was free to leave and that Dunkle was subjected to prolonged accusatory questioning, while in her nightgown, far from her home, and without her own transportation to return home.

26. *See Hammer v. State*, 1988 OK CR 149, ¶¶ 5–6, 760 P.2d 200, 202 (no Fifth Amendment violation where defendant Mirandized by officers in California, taken to airport and placed in holding cell for 90 minutes to await flight back to Oklahoma, and then confessed during flight).

27. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 2211 n. 3, 115 L.Ed.2d 158 (1991); *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456, 467 (1995).

28. The footnote in *McNeil* discusses the possibility of a defendant attempting, at his preliminary hearing in one case, to ward off being approached by officers in regard to *any* other crime, by prospectively invoking his *Miranda* rights regarding any other possible offense. The footnote, which is clearly dicta, postulates: "The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially *outside the context of custodial interrogation*, with similar future effect." *McNeil*, 501 U.S. at 182 n. 3, 111 S.Ct. at 2211 n. 3 (emphasis added). Similarly, the *Bradshaw* opinion, relying on the *McNeil* footnote, likewise addresses how early *Miranda* rights can be invoked, in order to ward off future questioning: "[T]he *Miranda* right to counsel has no applicability outside the context of custodial interrogation. Therefore, until the defendant was taken into custody, any effort on his part to invoke his *Miranda* rights was, legally speaking, an empty gesture." 457 S.E.2d at 467. The West Virginia Court's later statement, that "where police have given *Miranda* warnings outside the context of custodial interrogation, these warnings must be repeated once custodial interrogation begins," is not based upon *McNeil*. *See id.* Nor is it the law that a defendant can claim a Fifth Amendment *Miranda* violation simply by asserting that although he or she was Mirandized at the initiation of questioning, he or she was not actually "in custody" until some time shortly after the

the earlier warnings provided by Foster.[29] Nor does the State or Linn provide any legitimate rationale for Linn's decision not to Mirandize Dunkle, who, under the circumstances, was clearly considered to be a suspect in the shooting death of White. The rights protected by *Miranda* and the potential importance of information garnered through this kind of questioning are both too precious to be jeopardized by a failure to do what is so easily done: inform the person being interrogated of their rights under *Miranda*. Although Dunkle's Fifth Amendment rights were not violated by Linn's decision not to Mirandize her, the decision was, nevertheless, a bad one.

¶ 24 In Proposition III, Dunkle argues that the trial court erred in allowing the State to introduce irrelevant and prejudicial character evidence at trial. We review such claims for abuse of discretion.[30] Dunkle further argues that the State's emphasis upon this improper evidence constituted prosecutorial misconduct. Hence this Court must determine whether improper evidence and prosecutorial misconduct so infected Dunkle's trial that it was rendered fundamentally unfair, such that the jury's verdicts cannot be relied upon.[31]

¶ 25 It is a fundamental principle of evidence law that, with limited exceptions, "[e]vidence of a person's character or a trait of [her] character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."[32] Yet much of the State's case at trial appears directed toward establishing that Laura Dunkle was a bad person—a bad mother, an unloyal fiancée, a self-absorbed manipulator, and even, quite literally, a witch. The State repeatedly emphasized Dunkle's character, seemingly, in an attempt to persuade the jury that despite the lack of any readily apparent motive, she was the kind of person who would shoot her husband-to-be.[33] Much of the evidence presented by the State was not relevant to the murder charge at issue, and most of the irrelevant evidence presented was character evidence.[34]

¶ 26 The State revealed its intent to focus upon Dunkle's character prior to trial. Hence defense counsel filed a motion in limine asking the trial court to prohibit the presentation of evidence relating to (among other things): (1) Dunkle's "religious beliefs," (2) DHS involvement with Dunkle and her children, (3) letters sent by Dunkle to Mike Kelly from jail, and (4) recorded phone

questioning began—hence the warning "didn't count."

**29.** Linn testified that he spoke to Foster only "very, very briefly" that morning.

**30.** *See Davis v. State,* 2004 OK CR 36, ¶ 30, 103 P.3d 70, 79.

**31.** *See Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974) (consider whether challenged conduct made trial "so fundamentally unfair as to deny [defendant] due process"); *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).

**32.** 12 O.S.2001, § 2404(A). The equally well-established corollary to this principle is as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. 12 O.S.2001, § 2404(B). *See generally Burks v. State,* 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772

("The general rule is that when one is put on trial, one is to be convicted—if at all—by evidence which shows one guilty of the offense charged...."); *Wilkett v. State,* 1984 OK CR 16, ¶¶ 10–12, 674 P.2d 573, 576 (while State has limited right to rebut defense evidence of good character, it has no general right to present evidence of bad character).

**33.** The State did not present any evidence or offer any particular theory about why Dunkle would have shot White. Defense counsel focused on the State's failure to offer any motive evidence during his closing argument. And the prosecutor responded, during her final closing argument, "We don't have to know why Laura Dunkle chose to take his life. You don't have to decide why. There are many things in this life we're never going to know why. What you know is how." The prosecutor later added, "We don't have to have a motive. We know she did it."

**34.** Some of the irrelevant evidence presented was objected to at trial by defense counsel; some of it was not. In Proposition VIII, Dunkle raises an ineffective assistance of counsel claim, noting that although defense counsel challenged much of the State's character evidence before trial, he failed to renew many of his objections during trial.

conversations between Dunkle and Kelly while Dunkle was in jail. The motion was addressed at an extensive motion hearing on April 22, 2004.

¶ 27 The evidence relating to Dunkle's religious beliefs, *i.e.*, whether or not she practiced witchcraft, was focused upon during this hearing. Defense counsel argued that any allegation that Dunkle was involved in witchcraft would be totally irrelevant and inflammatory.[35] The prosecutor responded by arguing:

So it just, once again, is going to this is who she is and this is the person that she is, and I think we're entitled to show whether—she's an unusual person, and that's going to come out in the trial, and this is just one of the unusual aspects about this defendant.

Defense counsel countered that Dunkle's "religious practices" did not have anything to do with whether or not she shot White, and that even if they were somehow relevant, they should be excluded because they were so prejudicial. The court ruled that the State should approach the bench before asking any questions dealing with this issue.

¶ 28 Defense counsel also argued that the State should not be allowed to introduce evidence relating to the family's involvement with DHS, since most of this evidence was both irrelevant and prejudicial. In particular, defense counsel noted that some DHS records contained allegations that Dunkle had previously given her sons "sleeping substances" to help them sleep. He argued that the State should not be allowed to present evidence suggesting that Dunkle had drugged her children on the night of the shooting, since the testing of the children rebutted this allegation.[36] The trial court again deferred ruling on the issue and ordered the State to approach the bench before presenting any of this evidence, to allow defense counsel "ample time to object to it at that time."

¶ 29 At the time of the motion hearing, the trial court had not yet read Dunkle's letters to Mike Kelly from jail or heard their recorded phone conversations. Regarding the letters, the prosecutor argued that they contain relevant information,[37] and defense counsel requested that they be redacted to eliminate irrelevant references to the DHS case.[38] Regarding the jailhouse phone calls, the prosecutor asserted that she was unsure how many calls would be presented, beyond those of May 22, and July 2, 2003, because she didn't want to "take advantage of the Court or the jury" or "bore them to tears."[39] Once again, the court deferred its ruling on this evidence until trial.

¶ 30 At the trial the State focused upon Dunkle's character from start to finish. For example, the prosecutor's opening statement began as follows:

Ladies and Gentlemen of the Jury, we anticipate that the State's evidence in this case will prove and show that the defendant, Laura L. Dunkle, like a black widow spider, lured Gary Benton White into her web, a web of lies, death, and destruction.

---

**35.** Defense counsel noted that this allegation appeared in some DHS materials and that on the night of the shooting, Dunkle's sons (ages 9 and 11 at the time) were asked whether their mom did "church things" (referring to witchcraft) at home, and they answered "no." The State noted that witchcraft was also referred to in one of the recorded telephone conversations with Kelly.

**36.** On the night of the shooting, officers had a very difficult time waking the two boys and became concerned that they might have been drugged. They questioned the boys about whether Dunkle had given them anything, and one of them referred to being given "headache" medicine. Hence they decided to have the boys tested for drugs. Their urinalysis tests were negative for barbiturates and every other tested substance, though they did reveal the presence of an "am-

phetamine" in both boys. Later investigation revealed that the boys had been prescribed Adderall XR, an amphetamine commonly prescribed for Attention Deficit Hyperactivity Disorder.

**37.** In particular, the State noted that Dunkle's insistence that Kelly find her son's diary was significant, as was a reference to a previous "quarrel" between Dunkle and White.

**38.** Defense counsel's motion in limine also requested that if any of the letters or phone calls were admitted, that they be redacted to eliminate references to irrelevant and prejudicial information.

**39.** Defense counsel responded that he would just like notice of which calls were going to be used and he could object at trial.

The State's evidence will be that Laura L. Dunkle wanted Gary Benton White only to assist in obtaining her children back from Child Welfare.[40] Our evidence will be that she is possessive, selfish, and self-centered. The State's evidence will be that Gary Benton White was an unknowing victim of this defendant.

The depiction of Dunkle as a predatory spider was repeated in the State's closing arguments.[41] And portraying this defendant as frightening and "unusual" was a key theme of the State's case—even though the actual facts of this single-bullet shooting were not particularly creepy or strange.[42]

¶ 31 The suggestion that Dunkle was involved in witchcraft first came out during the questioning of Undersheriff Irene Perske. Without first approaching the bench, the prosecutor asked Perske what kind of questions "about church" she had asked Dunkle's younger son on the night of the shooting, and "what was the purpose of asking that question in reference to church?". Defense counsel immediately objected and argued, during the bench conference that followed, that this was the matter addressed by his motion in limine, that any witchcraft reference would be "highly prejudicial," and that the court would be "opening a can of worms" by allowing in the testimony.

¶ 32 The prosecutor responded by asserting that she really was not sure about the extent of Perske's knowledge regarding the witchcraft allegation.[43] The prosecutor then argued, "[E]ven though they find it objec-

tionable, I believe this jury is entitled to know who this defendant is." The trial court noted that it was "sort of between a rock and a hard place here, not knowing the relevance of [Perske's] answer yet," but ruled that she could answer the church question anyway. Perske then answered the pending question about why she had asked about "church," by stating that prior to the second interview of the boys, "there was something that came up, something about church, about the possibility of witchcraft or something of that fact." [44]

¶ 33 On cross examination defense counsel elicited testimony from Perske that when the two boys were asked about their mother doing "church stuff," they both said that she "didn't do any church stuff at home." On redirect examination the prosecutor then had the following exchange with Perske:

Q. All right. Now, going back to a question that Mr. Smith asked you. Neither of the boys—did either of the boys actually say that their mother was not involved in witchcraft?

A. No, they did not.

Q. Okay. And the question that they asked and the answer they gave you about church was about whether she did anything church wise at home; isn't that correct?

A. That's correct.

Later in the trial the prosecutor elicited testimony from Michael Priest, a friend and co-worker of White, that his first impression of Dunkle was that "she looked like a witch." [45]

---

**40.** Although the State presented some evidence that White attended hearings with Dunkle as she attempted to regain custody of her children, no evidence was presented substantiating the allegation that Dunkle's motivation for her relationship with White was obtaining his assistance in getting her children back. The State dropped this allegation from its closing argument.

**41.** During her final closing argument, the prosecutor again argued that "this defendant lured [Gary White] into her web, a web of deceit, lies, and destruction...." She continued, "Gary White made a fatal mistake, and that fatal mistake was hooking up with this defendant. Because, as you've now heard, she is like a black widow spider and all around her is death."

**42.** The prosecutor elicited testimony from Robin Klinglesmith, a co-worker and friend of White's,

that when she first saw Dunkle with White, "cold chills went up my spine." She also elicited testimony from Sharon White, White's ex-wife, that Dunkle "gave me the willies for some reason."

**43.** The prosecutor stated that if Perske "knows anything about that, it's only going to be that she heard something about that and that is why she asked them." She added, "We're not going into anything long and sorted [sic] about that subject."

**44.** When asked on cross examination where Perske had gotten the "church stuff" information, she stated that she did not recall where she had gotten that information.

**45.** The State argues in its brief that Priest's answer was unresponsive to the State's question about his first impression of Dunkle. The State's

Reviewing the trial as a whole leaves little doubt that the prosecutor intended to leave Dunkle's jury with the impression that she was involved in witchcraft, whether she did this "church stuff" at home or not.[46]

¶ 34 This Court recognizes that the State had substantial basis for its belief that Dunkle was involved in witchcraft. The tape recording of Dunkle's May 30, 2003, phone call to Mike Kelly from jail certainly supports this conclusion.[47] If Dunkle's jury heard the entire May 30 conversation, it would likely have been convinced that Dunkle was involved with witchcraft. Just prior to the playing of this recording, however, defense counsel objected, and the court ruled that the recording should be stopped prior to the discussion of Dunkle's witchcraft materials. Hence the jury did not hear this evidence during the trial. The actual compact disc containing the entire discussion, however, was not altered and was admitted into evidence as Exhibit 15A. Unfortunately, the record does not reveal whether the jury could have replayed the entire recording of the May 30 conversation during its deliberations.[48] Hence this Court does not know for sure whether or not Dunkle's jurors received or reviewed this evidence.

¶ 35 In *State v. Leitner*,[49] the Supreme Court of Kansas addressed a similar situation, where, in a first-degree murder trial of a woman who shot her ex-husband, the State cross-examined the defendant about her involvement with Wicca and "witchcraft."[50] The *Leitner* court examined the Supreme Court's decisions in *Dawson v. Delaware*[51] and *United States v. Abel*,[52] as well as a

questioning, however, paralleled its earlier questioning of the witnesses who testified that Dunkle gave them "cold chills" and "the willies." The State correctly notes that defense counsel failed to object to any of this testimony.

**46.** It is hard to read the entire trial transcripts and take seriously the State's argument, in its brief, that "[t]here was no attempt by the prosecutor to link the defendant to witchcraft."

**47.** During this recorded conversation, Kelly informs Dunkle that in one of the original searches of her home, officers found "your damn witchcraft shit you got back in the closet." Dunkle becomes frantic upon hearing this and argues, "They're not allowed to do that." Kelly responds that her attorney said that they could search her home because of the shooting and warns Dunkle that it will probably be brought up in one of her custody hearings. Dunkle is extremely upset by this suggestion and asserts, "Honey, that's a legal religion in America"; she also describes witchcraft as "an allowed religion in America." Kelly, who obviously disapproves, ends the conversation by telling her that he has "boxed all that up" for her.

**48.** The record contains no discussion about whether the jury had access to Exhibit 15A during its deliberations and no information about whether or not the jury had the equipment to replay it.

**49.** *State v. Leitner*, 272 Kan. 398, 34 P.3d 42 (2001).

**50.** *Id.* at 51. The Kansas Supreme Court described Wicca as "a pagan religion, sometimes referred to as witchcraft." *Id.* Although initially the trial court prohibited any mention of witch-craft, he later ruled that the defendant had "opened the door," and allowed the prosecutor to ask about the defendant's involvement with "witchcraft" and "pagan religion." *Id.* at 51–54.

**51.** *See Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992) (finding violation of 1st and 14th Amendments from admission of evidence of defendant's membership in Aryan Brotherhood in capital sentencing). The Supreme Court of Delaware had ruled that the membership evidence was admissible, since the defendant's character is a legitimate consideration in a capital sentencing. *Id.* at 163, 112 S.Ct. at 1096. Nevertheless, the U.S. Supreme Court concluded that the evidence should not have been admitted, because the State failed to establish any connection between membership in the group and the crime at issue: "Even if the Delaware group to which Dawson allegedly belongs is racist, those beliefs, so far as we can determine, had no relevance to the sentencing proceeding in this case." *Id.* at 166, 112 S.Ct. at 1098. The Court noted that "the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's [white] victim." *Id.* The Court concluded that Dawson's First Amendment rights were violated, "because the evidence proved nothing more than Dawson's abstract beliefs." *Id.* at 167, 112 S.Ct. at 1098. It can be inferred from Dawson that the Aryan Brotherhood evidence would have been even more improper if it had been admitted in the first stage of Dawson's murder trial, since the defendant's "character" is not even a legitimate consideration in the jury's determination of guilt or innocence.

**52.** *See United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (evidence of membership in Aryan Brotherhood admissible to

Nevada Supreme Court case,[53] and concluded:

> [A]lthough there is no per se barrier to the introduction of evidence of a person's membership or participation in a religious group or association, to be admissible such evidence should be related to the commission of the crime charged or should be used to show a person's possible bias or motive.[54]

The Kansas Supreme Court concluded that the State should not have been allowed to question the defendant about Wicca or witchcraft, since "[t]he record contains no hint or innuendo that her abstract beliefs had any connection to Leitner killing Michael." [55] The court rejected as "ludicrous" the State's argument that the defendant had opened the door to this evidence.[56]

¶ 36 The *Leitner* court emphasized the prejudicial nature of such evidence, noting that "the idea of witchcraft has generated terror and contempt throughout American history" and that "our culture associates witchcraft with Satanic worship and other evil practices." [57] Hence the Kansas Supreme Court concluded that "[a]ny mention of a defendant's involvement with witchcraft is highly prejudicial." [58] Nevertheless, the court affirmed Leitner's murder conviction, since the evidence against her was "overwhelming." [59]

 ¶ 37 We find that the trial court abused its discretion in allowing the State to present evidence suggesting that Dunkle practiced witchcraft. We emphasize that the State has never—at trial or on appeal—made any argument that the witchcraft evidence had *any* relevance whatsoever to the first-degree murder charge against Dunkle. Nor has the State offered any response to defense counsel's repeated assertions that the evidence was inflammatory and unduly prejudicial.[60] The trial court offered no cogent reason for allowing the witchcraft testimony, and we can find none.[61] We conclude that

impeach defense witness, where other evidence presented showing that members of Aryan Brotherhood are sworn to lie on behalf of each other). In *Abel*, the Supreme Court recognized that the Constitution does not erect an absolute ban on evidence about a defendant's constitutionally protected beliefs and associations. Where the State can establish a connection between the beliefs/associations and an issue before the jury, evidence regarding a defendant's beliefs/associations will sometimes be admissible. *Id.* at 52–54, 105 S.Ct. at 469–70.

53. The *Leitner* court noted that in *Flanagan v. State*, 109 Nev. 50, 846 P.2d 1053 (1993), the Nevada Supreme Court derived the following rule from *Dawson*: "Evidence of a constitutionally protected activity is admissible only if it is used for something more than general character evidence." *Leitner*, 34 P.3d at 54 (quoting *Flanagan*, 846 P.2d at 1056).

54. *Leitner*, 34 P.3d at 55.

55. *Id.* The court found that "the evidence showing that Leitner participated in Wicca bears no relevance to the crimes charged against her." *Id.* Hence it had "no probative value." *Id.* The court also concluded that the witchcraft evidence did not impeach the defendant. *Id.* at 56

56. *Id.* at 55. The State maintained that Leitner had "opened the door," by testifying that her husband had beaten her for no reason, because (argued the State) the real reason he had beaten

her was that she had gotten involved with witchcraft and attended a Wicca ceremony. *Id.* at 52.

57. *Id.* at 55, 56.

58. *Id.* at 56.

59. *Id.* at 57. Leitner testified that she tried to kill her husband two times during their marriage—once by putting rat poison in his coffee, and once by putting what she thought were poison mushrooms in his omelette. *Id.* at 47. She told various people that she and her boys would be better off financially if her ex-husband were dead; and she admitted to shooting him in the head three times, at close range, using two different guns. *Id.* at 56. Hence the Kansas Supreme Court concluded that "overwhelming evidence contradicts Leitner's story of self-defense." *Id.* at 57.

60. In *Dawson*, the Supreme Court observed that "on the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible." 503 U.S. at 167, 112 S.Ct. at 1098. It is difficult not to draw a parallel conclusion in the present case.

61. We reject the State's argument that Dunkle "opened the door to the issue of witchcraft," by asking about it on cross examination. Defense counsel had repeatedly objected to this witchcraft evidence and struggled to keep it out of Dunkle's trial. We will not find that Dunkle has waived her right to challenge the admission of this evidence, simply because her counsel at-

the witchcraft evidence was entirely irrelevant and unduly prejudicial. We find that the trial court abused its discretion by admitting this evidence, which violated Dunkle's rights under the First and Fourteenth Amendments.

¶ 38 The potential prejudice from the witchcraft references was substantial, even if the jury did not hear the entire May 30 discussion.[62] We note that the evidence in this case, though certainly sufficient to support Dunkle's conviction, was not "overwhelming." Dunkle had no criminal history, consistently denied shooting her husband-to-be, and had no known motive to kill him. Only one shot was fired, and the State failed to conclusively establish—through gun shot residue, fingerprints, DNA, or other comparable evidence—that Dunkle ever touched the gun or that she was in close proximity to it when it fired.[63]

¶ 39 We also note that the witchcraft references were part of a larger State pattern of attacking Dunkle's character, by portraying her as a frightening and unlikable person. Hence we evaluate the potential prejudice from this evidence by considering it in combination with the other character evidence that is challenged on appeal.

¶ 40 Within Proposition III, Dunkle also challenges the State's attempt to paint her as an unfit mother through improper character evidence. Yet defense counsel failed to object at trial to much of the evidence now challenged on appeal.[64] In particular, Dunkle challenges the State's attempt to suggest that she drugged her children on the night of the shooting. Despite pretrial efforts to keep this evidence out, however, defense counsel failed to object at trial to Undersheriff's Perske's testimony about how difficult it was to wake Dunkle's sons on the night of the shooting and to Dick Jones's testimony about the DHS decision to have the boys tested, because they "were looking at the possibility of them being drugged." [65] Thus this issue has been waived.[66] Furthermore, although the relevance of the testimony was limited, and suggesting that Dunkle drugged her sons appears unfairly prejudicial (in light of the urinalysis results), we likewise reject Dunkle's claim of prosecutorial misconduct in this regard.[67]

¶ 41 Dunkle also challenges the admission into evidence of State's Exhibit No. 14, which is a long, rambling letter she wrote to Mike Kelly from jail.[68] Despite raising pretrial objections and requesting that the letter be redacted, however, defense counsel stated that he had "no objection" to it at trial. Hence Dunkle's claim regarding this letter has been waived absent plain error. Although the letter certainly contains irrelevant and unduly prejudicial material,[69] it also contains relevant and admissible mate-

tempted to blunt its impact when the trial court allowed it in.

62. This Court's prejudice analysis does not assume that the jury heard this discussion, though we recognize that if the jury did listen to the entire discussion during its deliberations, the witchcraft references therein would have been extremely prejudicial.

63. Thus the evidence in Dunkle's case was totally unlike the evidence in *Leitner*.

64. In particular, defense counsel failed to object to the testimony of Dick Jones, a DHS child welfare specialist, about why DHS was involved with the family and the lack of emotion displayed by Dunkle's sons when they were informed of the shooting and told that their mother was in jail.

65. In fact, the record suggests that Dunkle's counsel made a reasonable strategic decision to allow this testimony and then rebut it with the results from the urinalysis tests. During the motion hearing, defense counsel stated that he had "no problem" with the State presenting evidence that the urinalysis tests done on Dunkle's sons did not reveal the presence of any sleeping pills, sedatives, or barbiturates. Hence we also reject Dunkle's (undeveloped) ineffective assistance claim in this regard (Proposition VIII).

66. And there is no plain error.

67. We note that the State's remark in its closing argument that the sleepiness of Dunkle's sons was "not normal" is not the same as arguing that they were drugged.

68. This was the only letter offered into evidence at trial.

69. For example, Dunkle's request that Kelly contact her sister and give her Dunkle's car, so she can take "the boys" with her to Washington, appears irrelevant and unduly prejudicial, since it suggests Dunkle is trying to have her sons taken away without DHS permission. The letter also contains substantial irrelevant ranting about attorneys involved in the family's DHS case,

rial.[70] In addition, the letter contains material helpful to Dunkle.[71] We do not find plain error in its admission.[72]

¶ 42 The six different recordings of Dunkle's telephone calls to Mike Kelly from jail, however, are another story. The phone recordings from May 8, May 13, May 27, May 30, June 18, and July 2, all of 2003, would have taken over 80 minutes to play at trial.[73] And they provided powerful support for the State's trial theme that Dunkle was a bad person and a "black widow spider." Reviewing these recordings in sequential order, as they were played for the jury, the listener can hear how Dunkle seeks out Kelly—who is, at first, quite reluctant to help or get involved in any way—and how, in a short time, she draws him into her various schemes

and gets him to do all kinds of favors for her, including caring for her animals, gathering and protecting her valuables, dealing with her attorneys, communicating with her family, paying her bills, dealing with her creditors, trying to get money out of her bank accounts, etc. Although initially Kelly is uncomfortable with the idea of looking through Dunkle's purse,[74] within a few weeks he is driving her car, living in her home, and sleeping in her bedroom.[75]

¶ 43 Despite the obvious romance between Dunkle and Kelly in the later phone calls, at trial the State denied having any theory that Kelly was involved in the shooting of White and also renounced offering the (subsequent) Dunkle/Kelly romance as a possible motive for the murder of White.[76] Although the

---

Dunkle's work history, and how unfair her bond amount is.

**70.** Dunkle's instruction that Kelly find her younger son's diary "before anyone else finds it" appears admissible, since it suggests possible evidence tampering and consciousness of guilt. Similarly, the statement "When I screw up I don't mess around do I!!" also appears admissible.

**71.** Dunkle's letter praises White admiringly and states that he and Dunkle were "soul-mate[s]" and that "this is a horrendous accident." It also states, "This is a very tragic accident[;] it was not in any possible way anything else. I was trying to prevent this happening. He wasn't going out to shoot coyotes & I had planned to knock the gun out of his hand. . . ."

**72.** We likewise reject Dunkle's (undeveloped) Proposition VIII ineffective assistance claim in this regard, which doest not explain how defense counsel's failures prejudiced Dunkle.

**73.** This total assumes the playing of the May 30 recording was cut short, as the court ordered. The compact disc that constitutes Exhibit 15A also contains a recording of a May 22, 2003, conversation between Dunkle and Kelly, which the State chose not to play at trial.

**74.** When Dunkle asks Kelly, on May 8, to get her purse and find her medication and a phone number inside, Kelly whines, "*Laura*, I don't want to go through your purse." In this initial call Kelly sounds reluctant to help Dunkle, dubious about her story, and very worried about getting himself in trouble. For example, he states that if he is going to go to her home, he wants to have the sheriff there to observe, so he doesn't get himself in trouble. Kelly also expresses shock when

Dunkle suggests that he should have taken her boys and "hid out with them in Blanchard," so they wouldn't get taken away. Kelly notes that that would be "kidnapping."

Similarly, in the May 13 call, when Dunkle tries to get Kelly to make sure that White's tools are secure (so his ex-wife won't steal them), Kelly responds, "Now Laura, I'm not going to get involved in that. You're trying to put me involved in shit I shouldn't be involved in." Near the end of the call he states that he is afraid to touch anything in her home and notes, "Like Mama said, I'm getting my shit involved in shit that I don't know what I'm getting into."

**75.** Dunkle concludes the May 8 phone call to Kelly by expressing appreciation for his help and stating, "I love you very much for doing this. Thank you." Kelly responds, "Bye." There is still no sign of romance in the May 13 phone call. By the May 27 phone call, however, Kelly is urging Dunkle to write him some "love letters," and when Dunkle concludes their call by thanking him and expressing her love, he responds, "I love you too." And by June 18, they are calling each other by pet names, carrying on like a pair of cooing/cursing love birds doing battle against the world, and having exchanges like: "I love you." "I love you more." "I love you best." "I love you better." During this same conversation Dunkle states that she is putting him down as her "common law" (husband) and is signing her parental rights over to him.

**76.** During her final closing argument, the prosecutor asserted: "The relationship between Michael Kelly and this defendant is very important. We're not saying that there's a conspiracy. Michael Kelly is just an old dumb boy, who obviously loves Laura Dunkle, and she starts telling him what to do as soon as she gets to jail." The prosecutor later added, "Michael Kelly is just an

prosecutor reviewed the contents of the telephone calls, at length, during her final closing argument, she focused almost exclusively on what the calls revealed about Dunkle's character. She emphasized that the phone calls revealed "the real Laura Dunkle," *i.e.,* the Laura Dunkle who is cold, calculating, self-absorbed, manipulative, angry, and almost totally void of regret or grief about the death of her husband-to-be.[77]

¶ 44 Although the trial court had deferred ruling on the admissibility of the jailhouse telephone recordings, the record suggests that both defense counsel and the trial court mistakenly believed that the court had already found this evidence admissible. Hence although defense counsel preserved Dunkle's earlier-stated objection to the admissibility of this evidence, he did not rearticulate his arguments for excluding the recordings. And the court did not provide any explanation for its decision to admit them.[78] Nor was there any discussion of defense counsel's earlier request that the recordings be redacted, to eliminate references to irrelevant and prejudicial information. This Court reviews the trial court's decision to admit these recordings for abuse of discretion.[79]

¶ 45 On appeal, the State offers a number of possible reasons why the recordings were relevant, which we take up in turn.[80] First, the State argues that the phone calls (along with the letter to Kelly) "are relevant to show consciousness of guilt by the defendant and her romantic relationship with Mr. Kelly, which is evidence of motive by the defendant to kill her fiancée [sic]." [81] Yet at trial the State specifically denied that the romance between Dunkle and Kelly was being offered as evidence of "motive" and acknowledged that it did not have any evidence regarding Dunkle's motive for shooting White. Furthermore, the State's candor at trial regarding this issue is supported by the record, which contains no evidence suggesting that the romance between Dunkle and Kelly pre-dated the shooting of White. Hence the recordings were not admissible as evidence of motive.

¶ 46 The State also asserts that the telephone recordings "were relevant to show inconsistencies in the defendant's various versions of what happened the night the victim was killed." Yet the State does not provide a single example from the recordings of Dunkle giving an inconsistent version of what happened on the night of the shooting.[82]

---

unwitting assistant after the fact for Laura Dunkle."

77. The prosecutor apologized for the length of the recordings, but noted, "[T]here's something very important in the phone calls. She is making plans with Michael Kelly two days after she killed Gary, and she has no feelings, no concern about anyone other than herself. She gives more feeling to her dogs and to her cats. That's what she's concerned about." The prosecutor noted that in the May 13 call, the jurors could hear Dunkle's "hardness of her heart and callousness," particularly in her obvious enthusiasm upon learning that the story of White's shooting had made the newspaper and that her picture was on the front page. The prosecutor commented that Dunkle's reaction to hearing that she had made the paper "should give anybody cold chills":

You would think she won the lottery. You don't hear that much joy when she's talking about her children. You sat and looked at this defendant as she sat here this week. These phone calls show you the real Laura Dunkle. You hear how she talks to him, Michael Kelly. You hear how she curses. You hear her anger, directed at her own attorney. You hear her anger, you hear the real Laura Dunkle.

78. When Exhibit 15A (containing the recorded telephone conversations) was offered into evidence, the following exchange occurred:

DEFENSE COUNSEL: You've already ruled on this, but we would have a standing objection to this.
THE COURT: Okay. Objection is noted. Overruled.

79. Since defense counsel failed to rearticulate his arguments for excluding the recordings, we will also consider whether the admission of these recordings, *in toto*, constituted plain error.

80. The State offers no response, however, to Dunkle's argument that the recordings were filled with material that was unduly prejudicial to her.

81. The State also asserts that Dunkle's telephone "expression of love for Mr. Kelly," and her statement that she is listing him as her common law husband "show a motive for killing the victim to get him out of the way."

82. Although the State focused upon inconsistencies in Dunkle's statements to investigators, it never argued that the phone calls contained any examples of Dunkle changing her story.

And this Court's review of the recordings reveals that, truthful or not, Dunkle was telling Kelly the same basic story that she had told investigators, *i.e.*, that White was shot as she tried to keep him from committing suicide and that it was an "accident."[83] Furthermore, and perhaps surprisingly, Dunkle and Kelly barely refer to what actually happened on the night of the shooting. Hence the recordings were not admissible on this basis.

¶ 47 The State also asserts that the recordings were admissible to show Dunkle's "continuing attempt to conceal evidence by telling Mr. Kelly to give it to her new attorney because it is a 'big part of the case.'" The reference occurs in the final recorded conversation, and the "it" being referred to is apparently the diary of Dunkle's younger son. The conversation indicates that Kelly found the diary, and Dunkle tells him to give to her attorney, because it is going to be a "big part of the case." It is unclear whether this discussion even supports the State's position that Dunkle was attempting to conceal evidence.[84] It is certainly not the best evidence of such. Furthermore, the State indicated at trial that it was not offering the phone conversations as evidence of an attempt to conceal evidence.[85] This Court finds that even if a small portion of the conversation on July 2, 2003, was admissible, this did not justify the admission of the entire conversation or of the other separate conversations. The prosecutor's arguments at trial suggest that the real purpose of playing this conversation was to expose the jury to the irrelevant (and nauseating) love banter of Dunkle and Kelly.[86]

¶ 48 Finally, the State argues that Dunkle's remarks, in the recording from June 18, 2003, that she won't do anything "stupid" again was admissible as a statement against interest.[87] This Court agrees. This portion of their conversation was relevant to the charge against Dunkle and was not unfairly prejudicial to her. This isolated portion of a single recording, however, did not justify the trial court's admission of the five other conversations.

¶ 49 This Court finds that the trial court abused its discretion in admitting the five other conversations, which together lasted over 69 minutes, with almost no relevant content and substantial content that was both irrelevant and unduly prejudicial. We note that even if we review the court's decision to allow the playing of the recordings only for plain error, the trial court should have quickly realized, upon hearing the recordings at trial, how irrelevant and how unfairly prejudicial they were, and cut them off. This did not happen. We find that the trial court's total failure to limit or constrain this evidence was plain error.[88]

83. During the May 30 call, Dunkle refers to the shooting as "a dreadful accident" and tells Kelly that "the forensics show that it was an accident," which "proves my innocence."

84. It is unclear from this particular discussion whether Dunkle was attempting to "conceal" the diary or whether she simply wanted to find it to help support her defense case.

85. The State specifically noted that it had chosen not to play the recorded conversation of May 22, 2003, since evidence on this issue was already before the jury through Dunkle's letter. We note that in the (unplayed) May 22 recording, Dunkle is much more insistent that Kelly find the diary and not let *anyone* else get it, because it is "the most important piece of evidence we have."

86. Near the end of her final closing, the prosecutor argued: "And when you look over at this person here in this courtroom, this defendant, don't ask yourself, can a little woman like this do that? Remember the woman on the tape and all those phone calls."

87. In the midst of discussing how much they miss each other and can't wait for Dunkle to get out of jail, Dunkle states, "I'm not doing anything more stupid, I swear. This is it." She later states, "No more stupidness, right?", and Kelly responds, "Yup."

88. This Court notes that although Dunkle fails to fully develop her Proposition VIII ineffective assistance claim, the record we have reviewed regarding Proposition III supports her ineffective assistance claim as well. Defense counsel's failure to fully articulate his objections at trial and to renew his request that the recordings be redacted was inadequate performance and not part of any reasonable strategy. Furthermore, this Court finds that if counsel had done his job and kept the inadmissible recordings out of Dunkle's trial, there was a reasonable probability of a different result in the jury's guilty verdict and in

¶ 50 We conclude that the trial court's admission of irrelevant and unfairly prejudicial character evidence entitles Dunkle to a new trial. In particular, we emphasize the serious error and potential prejudice from the admission of the "witchcraft" evidence and the recordings of Dunkle's telephone conversations with Kelly, as summarized above. We further conclude that the prosecutor's improper reliance upon and emphasis of this irrelevant and unduly prejudicial character evidence rendered Dunkle's trial fundamentally unfair, such that the jury's guilty verdict cannot be relied upon. This Court simply cannot confidently conclude, in the context of Dunkle's trial, that the improperly admitted evidence and the prosecutor's misconduct did not impact the verdict in this case.[89] Hence Dunkle's conviction for first-degree murder must be reversed.

¶ 51 In Proposition IV, Dunkle challenges portions of the testimony of O.S.B.I. Special Agent Tom Linn, who testified both as the lead investigator in the case and as a firearms expert. Dunkle argues that Linn repeatedly offered improper and speculative opinion testimony. We note that Agent Linn did offer his own opinion about whether Dunkle was telling the truth,[90] comment on things that "bothered" him about her statements, and speculate about why she might have acted as she did.[91] Yet defense counsel offered almost no objection to Linn's testimony. Although we need not decide this issue, due to our resolution of Proposition III, we caution that in any retrial of this case, both parties should strive to ensure that witness testimony, particularly expert testimony, be constrained within proper limits.[92]

¶ 52 In Proposition V, Dunkle challenges the State's use of computer-generated crime scene "reenactments," during the testimony of its crime scene reconstruction expert and final witness, OSBI Agent Iris Dalley.[93] Dunkle challenged the admissibility of the computer-generated animations and requested a *Daubert* hearing on the exhibit and the methodology used by Dalley to develop it.[94] The trial court agreed with the State's argument that Dalley's presentation was "not a *Daubert* issue," noted that the reenactments were "just a demonstrative aid," and overruled Dunkle's objections.[95]

¶ 53 The parties agree that the current question is governed by our decision in *Harris v. State*,[96] in which we addressed the admissibility of such computer-generated exhibits.[97] In *Harris*, we reviewed the South

Dunkle's sentence of life without parole. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (ineffective assistance requires showing of deficient performance and resulting prejudice).

89. In other words, the court's errors and State misconduct were not "harmless." We note that the improper evidence and argument also likely impacted the jury's sentencing decision in this case.

90. When asked by the State what the condition of the (properly cycled) gun found at the scene tells "us" about the story told to him by Dunkle, Linn responded, "That tells us that's not true. That's not a true story." Later, during cross examination, Linn testified that it was his "very educated and experienced opinion" that Dunkle was "lying" to him.

91. For example, Linn noted that although Dunkle initially called 911, there was no response when the operator answered; and Dunkle then called her friend and asked that friend to call 911 for her. Linn testified, "There's a little time lapse in there. Perhaps that's to get your

thoughts straight instead of answering questions that the 911 operator may ask."

92. *See, e.g., Mitchell v. State*, 2006 OK CR 20 ¶ 65 n. 142, 136 P.3d 671, 700 n. 142 (credibility and truthfulness of other witnesses not proper subject of expert testimony).

93. These reenactments are in the record as files on a compact disc, which is State's Exhibit 48.

94. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The State argued that *Daubert* did not apply.

95. Dunkle does not raise a *Daubert* claim on appeal; she challenges only the trial court's decision allowing the jury to view the computer-generated animations.

96. 2000 OK CR 20, 13 P.3d 489. The parties also agree that we review the trial court's decision, allowing use of this evidence, for abuse of discretion. *Id.* at ¶ 28, 13 P.3d at 497.

97. The *Harris* case involved two different types of reenactments: a video reenactment using live actors and a computer-generated animation. *Id.*

Carolina Supreme Court's approach to such evidence in *Clark v. Cantrell*,[98] as well as some of the major treatises on evidence,[99] and determined that the three-part test used in Clark was the appropriate standard in Oklahoma as well.[100] We wrote:

> In order for a video or computer crime scene reenactment to be seen by a jury, as an aid to illustrate an expert witness' testimony, the court should require (1) that it be authenticated—the trial court should determine that it is a correct representation of the object portrayed, or that it is a fair and accurate representation of the evidence to which it relates, (2) that it is relevant, and (3) that its probative value is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."[101]

¶ 54 We also held, in *Harris*, that juries should be specifically instructed regarding such reenactments:

> The court should give an instruction, contemporaneous with the time the evidence is presented, that the exhibition represents only a re-creation of the proponent's version of the event; that it should in no way be viewed as an actual recreation of the crime, and like all evidence, it may be accepted or rejected in whole or in part.[102]

We further noted that such video and computer-generated reenactments "are properly categorized as illustrative or demonstrative aids used to explain the expert's testimony" and that they should not be made available for the jury during deliberations, as they have "no independent evidentiary value."[103]

¶ 55 In *Harris*, the victim was shot three times in the head and once in the side of the abdomen, while seated in the passenger's seat of a vehicle.[104] The video reenactment used in that case was based upon bullet trajectories through the body and head of the victim into the seat and side panels of the vehicle.[105] The computer-generated animation was based upon the trajectory of the bullet passing through the victim's abdomen and into the vehicle seat.[106] We found that both exhibits were authenticated through the State's expert witness and that they were "correct representations of the objects and scenes portrayed" and were "fair and accurate representations of the evidence to which they relate."[107] Thus we concluded that the exhibits were "both authenticated and relevant."[108]

¶ 56 In our evaluation of the probative/prejudicial value of the reenactment exhibits, we noted that "[w]ith the measurements of the bullet trajectories, entry and exit wounds, it was possible through scientific and/or technical analysis to come to a conclusion about the position of the victim's body at the time of the shooting."[109] Hence this Court determined that the probative value of the reenactment exhibits "was not substantially outweighed by any of the dangers

at ¶ 6, 13 P.3d at 492. The current case involves only computer-generated animations.

98. *Id.* at ¶¶ 12–14, 13 P.3d at 494–95 (reviewing *Clark v. Cantrell*, 339 S.C. 369, 529 S.E.2d 528 (2000)).

99. *Id.* at ¶ 11, 13 P.3d at 493–94 (quoting from *Wharton's Criminal Evidence*, Eleventh Edition, and 2 Whinery, *Oklahoma Evidence* ).

100. *Id.* at ¶ 15, 13 P.3d at 495 ("We believe that the South Carolina guidelines represent a model for Oklahoma trial courts.").

101. *Id.* at ¶ 16, 13 P.3d at 495 (citing 12 O.S. 1991, §§ 2401–2403, 2901).

102. *Id.* at ¶ 17, 13 P.3d at 495. We also noted that the trial court must ensure that the opposing party had a "prior opportunity to examine the reenactment and underlying data." *Id.* Dunkle

does not dispute that she was given this opportunity in the current case.

103. *Id.* at ¶ 18, 13 P.3d at 495. Once again, the record does not reveal which exhibits were provided to Dunkle's jury or whether the jury could have reviewed evidence on compact disc.

104. *Id.* at ¶¶ 4–5, 13 P.3d at 492.

105. *Id.* at ¶ 6, 13 P.3d at 492; *id.* at ¶¶ 21–22, 13 P.3d at 496.

106. *Id.* at ¶ 6, 13 P.3d at 492.

107. *Id.* at ¶ 20, 13 P.3d at 495.

108. *Id.*

109. *Id.* at ¶ 25, 13 P.3d at 496.

enumerated in 12 O.S.1991, § 2403."[110] We concluded that the trial court in *Harris* did not abuse its discretion in allowing the video reenactments to be played for the jury in that case.[111]

¶ 57 We must now decide whether the computer-generated "reenactments" in the current case are comparable to those allowed in *Harris*. In Dalley's computer-generated animations, a barefoot female and a male victim are posed in various positions relative to steps on the outside of a home, with a gun held by one or the other or both of them; and the entire frame is then rotated, to allow viewing from different angles.[112] We note, initially, that the State's purpose in using the reenactments in this case was basically the same as its purpose in *Harris, i.e.*, to persuade the jury that the defendant's version of what happened was inconsistent with the evidence in the case, while the State's version was consistent with the evidence.[113] Yet the State's expert in the current case did not have *nearly* as much solid "data" with which to work in forming her conclusions about the relative positions of the victim and the defendant. And Dunkle's widely varying, incomplete, and often confusing statements about what happened made it very difficult—if not impossible—to actually determine what her "version" of the shooting really was.[114]

¶ 58 In the current case, the victim had only one bullet wound; the bullet did not pass through any other solid surface; and the bullet was never found. Consequently, although the trajectory of the bullet through the body of the victim could be determined, Dalley had no objective physical evidence from which to determine the position of the victim's body, at the time of the shooting, in relation to some other known point or surface. Instead, Dalley testified that she "determined that the body had simply fallen backwards," so she simply "stood the body back up on his feet" in her animations, by tipping the body straight back up from the position where it was found on the ground.[115] Dalley also testified that it was "consistent" with the evidence to assume that the victim was standing straight up or nearly straight up when he was shot, since he fell backward instead of forward.[116]

¶ 59 Hence Dally positioned the victim in the same spot in each of her four animations—a few feet in front of the three steps leading into the home, standing upright, facing the home. She also positioned the gun in the same position, based upon the bullet trajectory through the body of the victim, at a distance of 12 inches from the muzzle of the gun to the victim's chest. Dalley testified that she chose this distance based upon Gordon Robertson's statement to her that the powder patterns on the victim's shirt were "most consistent" with a distance of 12

110. *Id.* at ¶ 26, 13 P.3d at 496. We noted, in *Harris*, that the reenactment exhibits helped clear up possible confusion regarding the expert witness's testimony and that the trial court had given the jury a cautionary instruction regarding the reenactments. *Id.* at ¶¶ 26–27, 13 P.3d at 496–97.

111. *Id.* at ¶ 28, 13 P.3d at 497.

112. The visual effect is of a still picture being rotated, rather than a movie or true "reenactment" of a shooting, which appears similar to the exhibits used in *Harris*. *See id.* at ¶ 11, 13 P.3d at 493 ("The particular illustrative aids at issue here are similar in nature to posed photographs.").

113. *Id.* at ¶¶ 21–24, 13 P.3d at 496.

114. In addition, Dalley relied most heavily on specific details from statements made by Dunkle to Agent Linn, which, as noted earlier, were not recorded or videotaped.

115. On cross examination, Dalley testified that she "knew" the victim wasn't walking or moving around after he was shot, "[b]ecause there were no bloodstains in the area other than the stains that were on the ground at his left foot that appeared to be blood." Yet when the medical examiner was asked at trial how quickly the victim "would have succumbed to the wound," he responded: "That's very difficult to say. Not instantaneous, not a situation of numerous hours, but probably within several minutes."

116. Dalley testified that a scuff mark in the dusty, rocky dirt between the victim's legs (pictured in State's Exhibit 21) was likewise "consistent" with the victim scraping that dirt with his left heel, with his left leg "slightly bent," and then when the body fell, the leg relaxed and moved (down and to the left) to the position were it was found.

inches.[117] The trajectory of the bullet firing is shown as a line originating from the gun and going through the male victim in each of the animations. Dalley then varied the following in the four animations: the position of the barefoot woman, who was holding the gun, and how the gun was being held.

¶ 60 In the first animation, the victim is shown with his arms extended forward, holding the gun with both hands and pointed backward, firing into his own chest. The barefoot female is placed on the top step, inside the open door leading into the home, looking on as the victim shoots himself. According to Dalley this animation was based upon Dunkle's statement that the victim "shot himself." Dalley concluded that this scenario was not a viable one, because "typically suicides are contact wounds," while in this animation the male shooter is holding the gun one foot out in front of his chest.[118]

¶ 61 In the second animation, the barefoot female is placed on the second step. She is holding the grip of the gun in her right hand, pointed at the male victim, whose hands are placed along both sides of the gun. This animation was based upon Dunkle's statement to Linn about the position of their hands as she and White struggled over the gun. Dalley testified that Dunkle did not describe anyone having a finger on the trigger, which Dalley noted was inconsistent with the fact that the gun fired. Dalley also noted that the positioning of the hands around the side of the gun in this scenario was inconsistent with the fact that the gun had properly ejected a casing and re-cycled after firing.[119]

¶ 62 In the third animation, the barefoot female is placed on the first step. She is holding the gun in her right hand, pointed at the male victim, whose hands are again placed along both sides of the gun. This time the victim is leaning slightly toward the female and turning in toward the right. Dalley testified that this scenario was based on Dunkle's statement to Linn about how they were struggling over the gun and White was pushing into her hip or abdomen. Dalley acknowledged that her animation was "not exactly what was in the statement," since Dunkle described herself as being one step further up and White pushing into her, while Dalley's model did not show this "hard contact." Dalley testified that she had a hard time constructing this animation so that it would be consistent with the evidence that the victim fell backward and the female did not fall. She concluded that this scenario "did not work" and that considering the first three models, "none of these models is consistent with all the evidence."

¶ 63 When asked if there was "a scenario or a situation, based upon [her] experience, that is consistent with all of the evidence," Dalley introduced her fourth animation. In this animation the barefoot female is placed on the second step. She is holding the gun in her right hand, shooting directly at the male victim, who is facing her with his arms resting at his sides. During her final closing argument, the prosecutor argued that Dalley used the first three animations to "put[ ] a picture to what Laura Dunkle has been telling us," but that Dalley's fourth animation, of Dunkle shooting directly at White as he faced her, was "the only scenario consistent with the evidence at the scene."[120]

¶ 64 This Court finds that the State's use of the four computer-generated animations in the current case was inappropriate and potentially highly misleading to Dunkle's jury. Although the animations were authen-

---

**117.** Robertson's trial testimony was rather different, however, since he testified that the distance to the gun could have been anywhere from just past "contact" up to 18 inches. *See supra* note 18. At trial he was unwilling to speculate about a particular distance being the most likely.

**118.** Dalley noted that in her career she had never investigated a suicide where the evidence suggested that the victim "had held a handgun at that distance and shot himself or herself."

**119.** The prosecutor then commented, "So at this point, we've thrown out the first one, we've thrown out the second one. Let's look at the third one."

**120.** Although the prosecutor continually attempted to get Dalley to testify that the fourth animation was "the one scenario that is consistent" with the evidence, Dalley herself was somewhat more restrained, testifying instead that the final animation was "the one that I saw that was consistent with all of the evidence."

ticated through the testimony of Dalley, who created them, the record does not establish that they were truly relevant to the questions at issue in Dunkle's trial, since the record does not establish that they were "fair and accurate representations of the evidence to which they related." The evidence in this case simply did not adequately support the assumptions implicit in each of the four animations, in particular, the positioning of the male victim's body and the pictured distance between the victim and the gun. Nor does the record support Dalley's choices in defining the three possible "versions" of Dunkle's story.

¶ 65 While we recognize the potential value of computer-based animations within trials, we likewise recognize their potential danger, as did the South Carolina Supreme Court in *Clark*: "[A] computer animation can mislead a jury just as easily as it can educate them. An animation is only as good as the underlying testimony, physical data, and engineering assumptions that drive its images. The computer maxim 'garbage in, garbage out' applies to computer animations."[121] We conclude that the underlying data in the current case—including physical evidence, analysis of evidence at the crime scene, and statements from Dunkle—simply did not adequately support Dalley's computer animations. Hence the trial court should have kept these animations out of Dunkle's trial.

¶ 66 The first animation is perhaps the most misleading. While Dunkle stated, at various times, that White was attempting to kill himself (or at least that she thought he was) and that he "shot himself," she never described a scenario in which he held a gun one foot out in front of his chest and pulled the trigger, as she meekly and helplessly watched. The animation is intended to make Dunkle's suicide story appear ridiculous and does so; yet the story depicted is not one

that Dunkle ever told. The second and third animations are likewise based upon particular statements attributed to Dunkle, but leave out many other statements attributed to her, without any justification for the choice to "animate" particular statements, but not others.

¶ 67 Unfortunately, none of Dunkle's statements, even looked at in conjunction with other evidence, was clear or complete enough to justify the specific "picture" depicted in each of the first three scenarios. Rather, it appears that the State simply used the first three animations as "straw men" or "red herrings," to be knocked down and dispensed with, in order to set up the final animation as the "only one" that was consistent with all the evidence.

¶ 68 The use of computer-based animations has the potential to be highly prejudicial and misleading, since the computer-based images lend an air of technical and scientific certainty to the "reenacted" evidence, which may or may not be justified.[122] For example, in the current case, the State used Dalley's four computer animations, in conjunction with her testimony, to suggest that Dalley's expert testimony conclusively established the falseness of Dunkle's stories and the correctness of the State's theory of the case, when in fact, Dalley's analysis was not based upon principles of math, science, or physics. In reality, Dalley's "crime scene reconstruction" testimony was based almost entirely upon her analysis of the "consistency" of particular statements by Dunkle with other evidence put on by the State at trial: evidence about how suicides "usually" occur, evidence about the placement of keys near the victim's arm, evidence of a "heel scrape" in the dirt between the victim's legs, evidence about the workings of the gun and how it was found, *etc.* Although Dalley's use of the computer-

---

**121.** See *Clark,* 529 S.E.2d at 536 (quoting article in South Carolina Trial Lawyer Bulletin); *see also Harris,* 2000 OK CR 20, ¶ 12 n. 5, 13 P.3d at 494 n. 5 (quoting *Clark*).

**122.** In *Harris,* we distinguished "computer animations," which are used primarily to illustrate an expert's testimony, from "computer simulations," which "are created by entering data into computer models which analyze the data

and reach a conclusion," and thus "may have independent evidentiary value." See *Harris,* 2000 OK CR 20, ¶ 12 n. 6, 13 P.3d at 494 n. 6. While this distinction is an important one, a jury that is not properly instructed (as Dunkle's jury was not) could easily confuse a mere computer animation with its more substantial counterpart, the computer simulation—particularly if the jury is encouraged to do so by the presenting party.

generated animations suggested that she was adding a computer-based analysis to the other evidence in the case, a careful review of her testimony reveals that she was simply restating evidence already introduced and re-summarizing areas in which various statements by Dunkle were inconsistent with this evidence.[123]

¶ 69 Hence we conclude that the computer-generated animations used in the current case were not comparable to those approved in *Harris*. Because the animations were not fairly representative of the evidence in the case, they were not relevant. And even if they were relevant, their probative value was substantially outweighed by their potential to mislead and confuse Dunkle's jury regarding the strength and evidentiary basis of the State's evidence. Furthermore, because the animations in the present case were essentially a further restatement of the State's theory of the case—based upon previously admitted evidence and without new content or analysis—they were needlessly and unfairly cumulative. Thus the trial court abused its discretion in allowing the playing of the computer-generated animations in the current case.

■■■ ¶ 70 We note that Dunkle's counsel thoroughly cross-examined Dalley about the basis for her testimony and her reenactments, thereby revealing some of the limitations of her analysis. On the other hand, and contrary to our decision in *Harris*,[124] Dunkle's jury was not given any instruction about how it should understand and evaluate the State's computer-generated animations. And the prosecutor's portrayal of the significance of these animations—arguing that they established that Dunkle was lying and that the fourth one depicted "the only scenario consistent with the evidence at the scene"—further exacerbated their potentially prejudicial ef-

fect. We conclude that in the context of Dunkle's trial, defense counsel's efforts to reveal the limitations of the animations were insufficient to adequately mitigate the impact of this misleading evidence, which should not have been admitted in the first place. Hence the trial court's error in admitting this evidence was not harmless.

¶ 71 We have noted that the trial court failed to instruct Dunkle's jury about how it should understand and evaluate the "reenactment" animations presented in this case, in accord with our decision in *Harris*. Yet we must acknowledge that even though the *Harris* decision was published in 2000, the most current version of our Oklahoma Uniform Jury Instructions for Criminal cases ("OUJI–CR") still does not contain a uniform instruction regarding such evidence. Hence it is unsurprising that neither the parties nor the trial court recognized the need for such an instruction. Further delay in formulating this instruction, consistent with the mandate and language of *Harris*,[125] is neither advisable nor required. Hence we hereby find that the following instruction shall constitute OUJI–CR 9–46, entitled "Reenactment Evidence," and that it shall be given contemporaneously with the presentation of video, computer-based, or other comparable "reenactment" evidence, in accord with *Harris* and this opinion.

> **The State/The defendant** is about to present evidence in the form of a **video/computer animation/[other]**, which is intended to help illustrate certain testimony or evidence being presented to you. The exhibit being presented is *not* an actual recording or video of the event that is shown. Rather, the exhibit is offered simply as a "reenactment" of what may have occurred. The exhibit is intended to help you better understand the **State's/defendant's** posi-

---

123. For example, Dalley summarized her analysis stating, "a scenario that is consistent with all of the evidence is that Mr. White did not have his hands on the gun at the time the gun was fired"; she further noted, "if his hands are not on the gun, then someone else shot the gun."

124. *See Harris*, 2000 OK CR 20, ¶ 17, 13 P.3d at 495 (requiring that jury be given specific cautionary instruction at time video or computer-based reenactment exhibits are presented); *see also*

*Harris* (Lumpkin, J., specially concurring), ¶ 3, 13 P.3d at 501 ("It is even more imperative in cases which present expert testimony plus video/computer generated reenactments that the jury be instructed at the time the evidence is presented, in addition to the final written instructions, as to the limited purpose of the evidence and the expert testimony.").

125. *See id.*

tion about how an event occurred (or did not occur) and that party's understanding of the evidence supporting this interpretation. The exhibit is intended to assist you in your role as jurors, and like all evidence, it may be accepted or rejected by you, in whole or in part.

This instruction shall be used in all cases involving such reenactment evidence, following the publication of this opinion.[126]

¶ 72 In Proposition VI, Dunkle argues that the trial court erred by failing to instruct her jury on the affirmative defense of excusable homicide by accident or misfortune.[127] The State correctly notes that Dunkle failed to request this instruction at trial. Due to our resolution of Propositions III and V, we need not decide this claim in the current appeal. We note, however, that the State's assertion on appeal that there was "no evidence" to support Dunkle's defense that the shooting was accidental, i.e., that it would have been improper to instruct the jury on excusable homicide, is certainly wrong.[128] Evidence was presented to support Dunkle's claim that White was shot by accident, as Dunkle attempted to prevent him from committing suicide. If believed, this evidence would establish that the shooting was "excusable," and thus not a crime at all. Although disputed, the evidence presented within Dunkle's first trial was adequate to support the giving of the cited instructions in this case.

¶ 73 In Proposition VII, Dunkle challenges the trial court's failure to instruct her jury regarding parole eligibility when the jury sent the following questions out during delib-

erations: "What is the minimum time served for life w/o parole? How about w/ parole?". The trial court informed the parties that it intended to respond as follows: "You have all the instructions and evidence that are proper for you to consider." Although defense counsel agreed at trial that this was the "proper return," Dunkle now argues that her jury should have been instructed regarding the significance of Oklahoma's "85% Rule." [129]

¶ 74 This issue has been rendered moot by our reversal of the jury's verdict in this case. We note, however, that this Court has recently addressed this exact issue, in Anderson v. State,[130] and that any retrial in this case should be conducted in accord with this authority.

¶ 75 In Proposition VIII, Dunkle raises an ineffective assistance of counsel claim. This claim, which is not fully developed, has been rendered moot by our reversal of the jury's verdict in this case.

¶ 76 For the reasons discussed in connection with Propositions III and V, Dunkle's conviction for first-degree murder and her sentence of life without parole must be reversed.

### Decision

¶ 77 The Judgment and Sentence of the district court is **REVERSED,** and this case is **REMANDED FOR RETRIAL.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App.

126. We do not here adopt an instruction for cases involving computer or other technology-based "simulations," discussed *supra* in note 122, since this case does not involve such evidence and such evidence could potentially have independent evidentiary value, beyond merely illustrating the testimony of a witness or other evidence.

127. In particular, Dunkle asserts that her jury should have been instructed according to OUJI-CR 2d 8–27, 8–28, and 8–30.

128. The State itself presented evidence that the shooting was an "accident," by presenting Dunkle's statements that it was an accident. The State's position that these statements should not be believed does not change the fact that they were evidence in support of Dunkle's defense that the shooting was accidental. *See, e.g., Kin-*

*sey v. State,* 1990 OK CR 64, ¶ 8, 798 P.2d 630, 632 ("This Court has consistently held that a defendant is entitled to an instruction on his theory of defense where there is evidence to support it, even if such evidence is discredited.") (citation omitted); *Cipriano v. State,* 2001 OK CR 25, ¶ 30, 32 P.3d 869, 876 ("It is well established that a defendant is entitled to an instruction on any theory of defense supported by the evidence, as long as that theory is tenable as a matter of law.") (citation omitted).

129. *See* 21 O.S.2001, § 12.1 and 21 O.S.Supp. 2002, § 13.1. These two provisions together comprise the "85% Rule."

130. 2006 OK CR 6, 130 P.3d 273.

(2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, V.P.J., concur in part/dissent in part.

C. JOHNSON, A. JOHNSON and LEWIS, JJ., concur.

LUMPKIN, Vice–Presiding Judge: concur in part/dissent in part.

¶1 I concur in the finding that Appellant was denied a fair trial by improper character evidence. The admission of character evidence is governed by 12 O.S.2001, § 2404. The evidence in this case did not fall under one of the well established exceptions for admissibility. Further, the prosecution over-emphasized Appellant's connection to witchcraft to the point that it detracted the jury from their duty to decide the case based upon the law and the facts. Therefore, I agree that the witchcraft evidence was not relevant and not admissible but not for the reasons stated in the majority opinion.

¶2 I dissent to the Court's finding of an abuse of discretion by the trial court in admitting the computer generated crime scene re-enactments. The re-enactments were properly authenticated by Agent Dalley and were based upon her expert testimony. Agent Dalley testified the re-enactments were based upon the various statements Appellant made to the police and by comparing those statements to the actual physical evidence. Defense counsel thoroughly cross-examined Agent Dalley about the re-enactments and the basis for her conclusions. Any inconsistencies in her testimony or in the evidence used to support her conclusions or in her conclusions themselves were issues for the jury to weigh, not this Court.

¶3 Based upon her testimony in both direct and cross-examination, there was no danger the jury would be confused into believing the re-enactments were actual images of the crime. The re-enactments were clearly presented as possibilities with Agent Dalley commenting on the likelihood of each based upon her expert review of the physical evidence. The re-enactments were relevant evidence to rebut Appellant's claims that the shooting was an accident or suicide. Con-

trary to the majority opinion, this case involves the same type of "solid data" as in *Harris v. State*, 2000 OK CR 20, 13 P.3d 489, and the computer generated crime scene re-enactments were properly admitted under *Harris*.